MENG
28043



# SW I

## "UMBERTO D'AMATO"

## Gorgonia di Navigazione S.p.A., Napoli

## Capt. Michele D'Amato

**ITALIEN**



00010372



EXHIBIT

*tabbies*

**Darlehnsvertrag**



# LOAN AGREEMENT
# USD 30,175,000

**GORGONIA DI NAVIGAZIONE S.p.A.**
**(as Debtor)**

**and**

**DEUTSCHE SCHIFFSBANK**
**AKTIENGESELLSCHAFT**
**(as Bank)**

Newbuilding No. H1516A
of
Hudong-Zhonghua Shipbuilding (Group) Co. Ltd. and
China Shipbuilding Trading Company Ltd., China



## CONTENTS

1   PURPOSE_____ 2

2   DRAWINGS_____ 2

3   CONDITIONS PRECEDENT AND SUBSEQUENT_____ 3

4   PERFORMANCE-GUARANTEE-COMMISSION_____ 6

5   INTEREST_____ 7

6   REPAYMENT AND PREPAYMENT OF THE LOAN_____10

7   EXPIRY DATE OF THE PERFORMANCE GUARANTEE_____11

8   FEES_____11

9   SECURITY  DOCUMENTS_____11

10  SWAP OPTION_____15

11  FINANCIAL DERIVATIVES TRANSACTIONS_____16

12  PAYMENTS; MANDATORY PREPAYMENT; RESERVE REQUIREMENTS
    AND ILLEGALITY_____17

13  MAINTENANCE OF SECURITY_____19

14  ASSIGNMENT_____20

15  MISCELLANEOUS_____20

16  LAW AND PLACE OF JURISDICTION_____22



# LOAN AGREEMENT

Dated 29. September 2006

**BETWEEN:**

(1) **Gorgonia di Navigazione S.p.A.**, a company incorporated according to the laws of Italy whose registered office is at Via Giovanni Porzio, 4, Centro Direzionale, Isola G/2, I-80143 Naples/Italy (the "Debtor") and

(2) **Deutsche Schiffsbank Aktiengesellschaft**, Bremen/Hamburg, acting through its office at Domshof 17, D-28195 Bremen, Federal Republic of Germany, (the "Bank").

**WHEREAS:**

(A) D'Amato di Navigazione S.p.A., ("D'Amato") a company incorporated according to the laws of Italy whose registered office is at Via Giovanni Porzio, 4, Centro Direzionale, Isola G/2, I-80143 Naples/Italy, has contracted as buyer in the name of D'Amato di Navigazione S.p.A. or nominee with China Shipbuilding Trading Company Ltd. and Hudong-Zhonghua Shipbuilding (Group) Co. Ltd., China (collectively the "Seller") to purchase and take delivery of one bulkcarrier newbuilding of 75.000 dwt with Seller's hull no. H1516A (the "Newbuilding") pursuant to a shipbuilding contract dated 28 March 2006 (as amended) (the "Newbuilding Contract") with expected delivery in August 2008 (the actual date when the Newbuilding will be delivered hereinafter the "Delivery Date") at a price of USD 35,500,000 (the "Contract Price").

(B) The Debtor shall be nominated by D'Amato as buyer to the Newbuilding Contract and shall assume the position of D'Amato as buyer in due course.

(C) Subject to and upon the terms and conditions of this Loan Agreement the Bank has agreed

    1.   to advance to the Debtor a maximum loan amount of USD 30,175,000 (hereinafter called the "Loan", which expression shall also mean the amount advanced and from time to time outstanding) and

    2.   to issue a guarantee in favour of the Seller (the "Performance Guarantee") in the amount of USD 3,550,000 (the "Guaranteed Amount").

        - the Loan and the Performance Guarantee together the "Total Loan" -

**IT IS AGREED AS FOLLOWS:**



2

## 1.  **PURPOSE**

1.1  The Loan is to assist the Debtor in financing part of the Contract Price under the Newbuilding Contract and shall be used exclusively for this purpose, and in entering this Loan Agreement and borrowing the Loan (or any part thereof) the Debtor represents and warrants the Bank to act on its own account.

The Bank shall be under no obligation to advance all or any part of the Loan after 28 February 2009 unless the Bank in its absolute discretion agrees otherwise.

1.2  The Performance Guarantee is to assist the Debtor to fulfil the obligations of the buyer under the Newbuilding Contract and will be issued as security for payment of the 2nd instalment of the Contract Price in a form and wording as per Enclosure 1 (the "Performance Guarantee Deed"). The Bank shall be under no obligation to issue the Performance Guarantee (or any part thereof) after 28 February 2007 unless the Bank in its absolute discretion agrees otherwise.

## 2.  **DRAWINGS**

2.1  Pursuant to the Newbuilding Contract the following amounts are becoming due and payable to the Seller at the following events:

| Contract Instalment N° | Event | Date | Amount -USD- |
|---|---|---|---|
| 1 | Contract Signing | 10/2006 | 7,100,000 |
| 2 | Steel Cutting | 11/2007 | 3,550,000 |
| 3 | Keel Laying | 02/2008 | 3,550,000 |
| 4 | Launching | 05/2008 | 3,550,000 |
| 5 | Delivery | 08/2008 | 17,750,000 |
| | | | 35,500,000 |

2.2  Subject to the conditions precedent being fulfilled as per Clause 3 below the Loan shall be advanced to the Debtor as follows:

(a)  In five drawings (each on "Drawing") as follows:

| Drawing No. | Event | Amount - USD - |
|---|---|---|
| 1 | Contract Signing | 6,035,000 |
| 1 | Steel Cutting | 3,017,500 |
| 2 | Keel Laying | 3,017,500 |
| 3 | Launching | 3,017,500 |
| 4 | Delivery | 15,087,500 |
| | | 30,175,000 |



On each event the Bank will transfer to the Seller the relevant amount due under the Newbuilding Contract and any balance remaining in accordance with the written instructions of the Debtor.

(b) Prior to or simultaneously with each Drawing the Debtor shall make available to the Bank on its account No 36008979 with Citibank N.A., New York (SWIFT: CITIUS33) its relevant equity contribution (the "Equity Contribution") for receipt by the Bank prior to the transfer of funds by the Bank to the Seller as follows:

| Drawing No. | Event | Equity Contribution - USD - |
|---|---|---|
| 1 | Contract Signing | 1,065,000 |
| 1 | Steel Cutting | 532,500 |
| 2 | Keel Laying | 532,500 |
| 3 | Launching | 532,500 |
| 4 | Delivery | 2,662,500 |
| | | 5,325,000 |

2.3 Subject to conditions precedent being fulfilled as per Clause 3 below the Performance Guarantee will be issued when required under the Newbuilding Contract and demanded by the Seller.

## 3.   **CONDITIONS PRECEDENT AND SUBSEQUENT**

The Total Loan or any part thereof will only be made available to the Debtor after the Debtor has fulfilled the following terms and conditions.

3.1 Prior to or simultaneously with the issuing of the Performance Guarantee:

3.1.1 The Bank or its counsels shall have received the following documents in form and substance acceptable to them

3.1.1.1 This Loan Agreement duly signed and accepted by the Debtor.

3.1.1.2 A resolution by a competent body of authority of the Debtor granting approval for the Debtor to borrow and/or secure the Total Loan as contemplated under this Loan Agreement and naming those persons authorised to execute the Loan Agreement and the relevant Securities (as per Clause 9 hereof) together with the respective power of attorney duly executed.

3.1.1.3 The articles of association of the Debtor.

3.1.1.4 The company registration certificates of the Debtor.

3.1.1.5 The Second Mortgage against the Collateral Vessel as per Clause 9.1.2 hereof duly executed by D'Amato together with certificates or other evidence of its due registration.



3.1.1.6  The amendment to the General Earnings Assignment against the Collateral Vessel as per Clause 9.2.2 hereof is duly executed by D'Amato.

3.1.1.7  The amendment to the Assignment of Insurances against the Collateral Vessel as per Clause 9.3.2 hereof is duly executed by D'Amato together with certificates or other evidence that the Collateral Vessel is insured in accordance with the provisions of this Loan Agreement.

3.1.1.8  The original Refund Guarantee plus duly executed assignment of the Refund Guarantee by D'Amato as per Clause 9.4 hereof.

3.1.1.9  Signed or certified copy of the Newbuilding Contract and the duly executed assignment of the Newbuilding Contract by D'Amato as per Clause 9.4 hereof.

3.1.1.10  The Corporate Guarantee of D'Amato as per Clause 9.6 hereof.

3.1.1.11  The Personal Guarantee of the Personal Guarantor as per Clause 9.5 hereof.

3.1.1.12  A certificate of confirmation of class for hull and machinery confirming that the Collateral Vessel is classed with the highest class without recommendations.

3.1.2  The Bank shall have received not more than fifteen (15) and not fewer than three (3) Business Days` prior to the required drawdown date a Performance Guarantee Issue Request in writing in form set out in Enclosure 2a hereto.

Business Day within this Loan Agreement means any day on which banks are open for the transaction of business of the nature contemplated by this Loan Agreement in New York, United States of America; London, England; Naples, Italy and Bremen, Germany.

3.1.3  There shall exist no event of default under this Loan Agreement and no event which with the giving of notice or lapse of time, or both could constitute such an event of default. Same applies to any other loan agreement between the Bank and any other company belonging to the group of companies affiliated with the Debtor. 

3.1.4  Neither the making of the Total Loan (or an part thereof) nor any action which is required in accordance with the terms of this Loan Agreement in connection with the making of the Total Loan (or any part thereof) shall be in violation of any law, decree or licence applicable to the Bank the Debtor and/or D'Amato.

3.1.5  Confirmation satisfactory to the Bank that all legal opinions required by the Bank will be given materially in form required by the Bank.

3.2  Prior to or simultaneously with Drawing No. 1

3.2.1.  the Bank or its counsel shall have received the following documents in form and substance acceptable to them:





3.2.1.1 A certificate by the Debtor confirming that the documents listed in Clauses 3.1.1.2 to 3.1.1.11 hereof remain unamended and in full force and effect. 

3.2.1.2 A copy of the Seller's invoice for the respective Contract Instalment.

3.2.1.3 Acceptable evidence to the Bank that the corresponding Equity Contribution (as referred to in Clause 2.2 (b) above) has been paid by the Debtor to the Bank. 

3.2.2 The Bank shall have received not more than fifteen (15) and not fewer than three (3) Business Days` prior to the required drawdown date a Drawdown Notice in writing in form set out in Enclosure 2b hereto. 

3.2.3 The conditions as per 3.1.3, 3.1.4 and 3.1.5 hereof shall apply mutatis mutandis.

3.3 <u>Each time prior to or simultaneously with Drawing No. 2, 3 and/or 4</u>

3.3.1 the Bank or its counsel shall have received the following documents in form and substance acceptable to them:

3.3.1.1 A certificate by the Debtor confirming that the documents listed in Clauses 3.1.1.2 to 3.1.1.11 hereof remain unamended and in full force and effect.

3.3.1.2 The documents listed in Clause 3.2.1.2 and 3.2.2 hereof.

3.3.1.3 The acceptable evidence analogous to Clause 3.2.1.3 above.

3.3.1.4 Acceptable evidence to the Bank that the Debtor has been nominated by D'Amato and accepted by the Seller and the Refund Guarantor as buyer to the Newbuilding Contract.

3.3.2 The conditions as per 3.1.3, 3.1.4 and 3.1.5 hereof shall apply mutatis mutandis.

3.4 <u>Prior to or simultaneously with Drawing No. 5</u>

3.4.1 the Bank or its counsel shall have received the following documents in form and substance acceptable to them:

3.4.1.1 A certificate of the Debtor confirming that the documents listed in Clause 3.1.1.2 to 3.1.1.11 hereof remain unamended and in full force and effect

3.4.1.2 The documents listed in Clause 3.2.1.2 and 3.2.2 hereof

3.4.1.3 Acknowledgement from the port authorities of Naples, Italy evidencing that the Debtor has full and unencumbered title to the Newbuilding

3.4.1.4 Evidence that the Newbuilding is classed with Registro Italiano Navale and that all class certificates are in full force and effect.



3.4.1.5  The Mortgage on the Newbuilding as per Clause 9.1.1 hereof is duly executed by the Debtor together with certificates or other evidence that the Mortgage has been duly delivered by the Debtor for registration against the Newbuilding.

3.4.1.6  The First General Assignment of all earnings of the Newbuilding as per Clause 9.2.1 hereof is duly executed by the Debtor.

3.4.1.7  The First Assignment as per Clause 9.3.1 hereof of all insurance claims is duly executed by the Debtor together with certificates or other evidence that the Newbuilding is insured in accordance with the provisions of this Loan Agreement.

3.4.1.8  The documents listed in Clauses 3.2.1.2, 3.2.2. and the evidence as per Clause 3.2.1.3.

3.4.1.9  The builder's certificate and the declaration of warranty of the Seller.

3.4.2  The conditions as per Clause 3.1.3, 3.1.4 and 3.1.5 shall apply mutatis mutandis.

3.5  <u>Conditions subsequent:</u>

3.5.1  Not later than 3 months after Drawing No. 1 has been made available to the Debtor the Bank or its counsel shall have received the following documents in form and substance acceptable to them:

3.5.1.1  The acknowledgement of the assignment of the Refund Guarantee duly executed by the Refund Guarantor;

3.5.1.2  evidence acceptable to the Bank that the Refund Guarantee and the assignment of the Refund Guarantee are registered with the Chinese State Administration of Foreign Exchange (SAFE),

3.5.1.3  a legal opinion (satisfactory to the Bank) that the Refund Guarantee and its assignment under all aspects are valid, in compliance with Chinese Law; and

3.5.1.4  the acknowledgement of the assignment of the Newbuilding Contract duly executed by the Seller.

3.5.2  Not later than 30 April 2007 the Bank or its counsel shall have received evidence - in form and substance acceptable to the Bank - that the Debtor has been nominated by D'Amato and has been accepted by the Seller and the Refund Guarantor as buyer to the Newbuilding Contract.

## 4.  PERFORMANCE-GUARANTEE-COMMISSION

The Performance-Guarantee-Commission means in respect of the Performance Guarantee a commission of 1% p.a. on the Guaranteed Amount. Such Performance-Guarantee-Commission shall be payable quarterly in arrears, the first time three (3) months after



issuing of the Performance Guarantee and last time on the Expiry Date (as per Clause 7 hereof).

The Performance-Guarantee-Commission shall be calculated on the basis of a three hundred and sixty (360) day year and the actual number of days elapsed.

## 5.  **INTEREST**

5.1   Interest shall accrue on the Loan or the balance thereof from time to time outstanding at the rate being the aggregate of (i) the rate being the average (rounded upwards to the nearest whole multiple of one sixteenth of one per centum (1/16%)) of the per annum rates listed on the FRBD to G-Listings published by Reuters News Service on its listing of London Interbank Offered Rates (or such other page or service as may replace it) at or about 11:00 a.m. (London time) - herein called "the Basic Rate" - in respect of each period of three (3) or six (6) months as may be selected by the Debtor or such longer period agreed with the Bank (the "Interest Period") and (ii) the Margin of 1% p.a. as determined as applicable

5.1.1   two (2) Business Days prior to the date of drawdown of Drawing No. 1 and thereafter

5.1.2   two (2) Business Days prior to the expiration of the preceding Interest Period for deposits equal to the Loan or balance thereof from time to time outstanding for each Interest Period, provided that if the Debtor shall fail to make a selection three (3) Business Days prior to drawdown of Drawing No. 1 or termination of any Interest Period in accordance with the Drawdown Notice for Drawing No. 1 referred to in Clause 3.2.2 hereof and thereafter with a Renewal Notice as per Enclosure 3 hereto or agree with the Bank as aforesaid then the rate of interest for the next Interest Period shall be that applicable for a period of three (3) months as determined as aforesaid.

If no such Basic Rate is then available it will be replaced by a rate at which deposits of an amount approximately equal to the amount outstanding under the Loan during such Interest Period and for same period as such Interest Period are offered to the Bank by leading banks in the Inter-Bank Euro-Market.

5.2   Each determination of an interest rate made in accordance with this Clause 5 shall be final and conclusive save for manifest error and shall be promptly notified to the Debtor in writing.

5.3   In the event of an Interest Period being fixed for such duration that a part of the Loan is to be repaid within such Interest Period the interest rate will be fixed for the amount of that part of the Loan so repaid for the period running from the beginning of such Interest Period to the date upon which the said repayment is to be made and interest is payable on such date and for the balance of the Loan (less the amount to be repaid within such Interest Period) the interest will be fixed as aforesaid for the agreed Interest Period.

5.4   Each Interest Period selected or agreed pursuant to Clause 5.1 hereof shall end on the date which numerically corresponds to the date on which the immediately preceding Interest Period ended (or, in the case of the first Interest Period, to the



relevant Drawdown Date) in the calendar month which is the number of months selected or agreed after the calendar month in which the immediately preceding Interest Period ended (or, in the case of the first Interest Period, in which the relevant drawdown date occurred), except that:

5.4.1   if there is no such numerically corresponding date in the calendar month in which the Interest Period ends, that Interest Period shall end on the last Business Day in that calendar month;

5.4.2   if any Interest Period would end on a day which is not a Business Day, that Interest Period shall end on the next succeeding Business Day (unless the next succeeding Business Day falls in the next calendar month, in which event the Interest Period in question shall end on the next preceding Business Day);

5.4.3   if the immediately preceding Interest Period ended (or, in relation to the first Interest Period, the relevant Drawdown Date occurred) on the last Business Day in a calendar month, all subsequent Interest Periods shall end on the last Business Day in the relevant calendar month.

5.4.4   Notwithstanding the above the first Interest Period with respect to each of Drawing No. 2, 3 and 4 shall be of such a length as to end on the same date as the then current Interest Period applicable to the remainder of the Loan, thereafter all Interest Periods shall run concurrently.

Any adjustment made pursuant to Clause 5.4 hereof shall be taken into account in calculating the interest payable by the Debtor for the Interest Period in question, but shall be ignored for the purpose of determining the date on which any subsequent Interest Period shall end.

5.5   Interest shall be calculated on the Loan as and from the commencement date of each Interest Period to the last day of each Interest Period and shall be paid on the last day of each Interest Period and during any Interest Period in excess of six (6) months on the last day of each successive six (6) months period after the commencement of such Interest Period.

5.6   In the event of an Interest Period being fixed on request of the Debtor for a duration in excess of twelve (12) months at a fixed rate (hererin called "Fixed Interest Period") interest during such Fixed Interest Period shall be calculated on the amount of the Loan from time to time outstanding as from the commencement date of the Fixed Interest Period to the last day of the Fixed Interest Period and shall be paid on the last day of the Fixed Interest Period and during the Fixed Interest Period on the dates upon which repayments are to be made.

5.7   In the event of any default by the Debtor in the due repayment as herein provided of the Loan or the payment of interest or any part or parts thereof or any other sums payable to the Bank hereunder or under the Securities defined in Clause 9 hereof then the Debtor shall as from the date of such default pay to the Bank interest on the amounts not paid up to the date of actual payment (both before and after judgment) at a rate ("the Default Rate") of two per centum (2%) per annum above the funding rate charged to the Bank on a day to day basis subject to any mutual agreement to the contrary.



It is hereby expressly agreed between the Bank and the Debtor that on overdue interest the default interest rate shall also be charged in accordance with the above regulation.

In respect of payments received from the Debtor or any third party the Bank is entitled to set off the monies in their sole discretion against any due debts of the Debtor of whatsoever nature. In case the Bank should abstain from applying the set off at the request of the Debtor the Bank has to inform the Debtor accordingly.

5.8 Interest shall be calculated on the basis of a three hundred and sixty (360) day year and the actual number of days elapsed.

5.9 In the event that the Bank shall determine at any time that by reason of changes affecting the London Interbank Market adequate and fair means do not exist for ascertaining the rate of interest on the Loan (or any part thereof) pursuant to the terms thereof or that the continuation of the Loan (or any part thereof) as a loan has been made impracticable by the occurrence of a contingency or event which materially and adversely affects the Interbank Market (other than a contingency contemplated above) then and in any such event

5.9.1 the Bank shall forthwith give notice to the Debtor of the occurrence of such event; and

5.9.2 the Bank shall as soon as possible certify to the Debtor in writing the effective cost to the Bank of maintaining the Loan for such further period as shall be selected by the Bank and the rate of interest payable by the Debtor for such period; or if that is not acceptable to the Debtor

5.9.3 the Bank will negotiate with the Debtor in good faith with a view to modifying this Loan Agreement to provide a substitute basis for the Loan which is financially a substantial equivalent to the basis provided for herein and if within thirty (30) days of the giving of notice referred to in Clause 5.9.1 the Debtor and the Bank shall fail to agree in writing upon such substitute basis the Debtor will forthwith repay the Loan, interest thereon and all costs and expenses connected therewith, provided that if such repayment is made on a day other than the last day of an Interest Period the Debtor shall in addition pay to the Bank the sum which shall be necessary to compensate the Bank for any cost, loss, premium or penalty incurred or to be incurred by the Bank as the result of such repayment, including, without limitation, any losses or costs incurred in liquidating or re-employing fixed deposits from third parties acquired to effect or maintain the Loan.

5.10 In the event the Debtor does not draw down the Loan or any part thereof after the rate of interest is fixed, the Debtor shall pay a compensation calculated as difference between the rates obtainable by the Bank for replacement of the funds in the market and that rate of interest already fixed. Such compensation fee will be charged from the commencement date of such Interest Period to the last day of such Interest Period.



## 6.   REPAYMENT AND PREPAYMENT OF THE LOAN

6.1   The Debtor agrees to repay the Loan by twenty (20) consecutive semi-annual repayment instalments as set forth in Enclosure 4 hereto. The first repayment instalment is payable six (6) months after the Delivery Date of the Newbuilding and the final repayment instalment one hundred and twenty (120) months after the Delivery Date of the Newbuilding. The last repayment instalment includes a balloon of USD 8,735,000.

6.2   In the event that for whatsoever reason the Newbuilding is not delivered to the Debtor by 28 February 2009 at the latest then any amount outstanding under the Loan including interest accrued thereon and all other amounts due to the Bank shall become due and payable by the Debtor on that date without further notice of the Bank to the Debtor.

6.3   The Debtor has the right to prepay the Loan in full or in part, however, in an amount which is not less than USD 500,000 (the "Prepayment").
Any Prepayment under this Clause 6 in an amount less than the amount outstanding under the Loan shall be applied against the remaining repayment instalments of the Loan either pro-rata or in inverse order of maturity (at Debtor's option).

6.4   The Debtor shall give to the Bank not less than ten (10) days prior written notice as to Prepayments advising the amount to be prepaid. Such notice shall be irrevocable and the Debtor shall be bound to make such Prepayment in accordance with such notice.

No amount prepaid under this Clause 6 may be reborrowed in any circumstance.

6.5   If any Prepayment under this Clause 6 is effected on a Business Day other than the last day of an Interest Period the Debtor shall pay to the Bank in addition such sums as the Bank shall certify is necessary to compensate the Bank for any loss incurred in liquidating or re-employing fixed deposits from third parties acquired to effect or maintain the Loan.

6.6   the Debtor will pay to the Bank a Prepayment Fee of 0.25% flat on the amount of any Prepayment under this Clause 6 in the event that the Loan or part thereof is refinanced by another lender within a period starting with the date of this Loan Agreement and ending at the date of the second anniversary of the actual Delivery Date of the Newbuilding.

6.7   If the Newbuilding shall become an actual constructive agreed or compromised total loss the Debtor shall prepay within 190 days of the occurrence of the event giving rise to the total loss the amount outstanding under the Loan together with interest accrued thereon and all other amounts due to the Bank.



11

**7. EXPIRY DATE OF THE PERFORMANCE GUARANTEE**

The Performance Guarantee shall expire according to Clause (9) of the Performance Guarantee Deed (the "Expiry Date").

**8. FEES**

8.1 The Debtor shall pay to the Bank a Front End Fee of 0.25% flat on the Loan (equal to USD 75,437.50) on the date of this Loan Agreement.

8.2 The Debtor shall pay to the Bank a Commitment Fee at the rate of 0.20% per annum on any undrawn amount of the Loan as from 19 September 2006. The first payment of the Commitment Fee shall be made on 30 December 2006 and subsequent payments shall be made at quarterly intervals thereafter and last time (which of both following dates is the earlier date) on the Delivery Date or 28 February 2009.

No Commitment Fee shall be paid on the amount of Drawing No. 2 as long as the Debtor pays Performance-Guarantee-Commission on the Guaranteed Amount.

8.3 The Debtor shall pay to the Bank a Handling Fee of USD 5,000.00 flat on the date of this Loan Agreement.

**9. SECURITY DOCUMENTS**

As security for the due repayment of the Performance-Guarantee-Commission, the Loan, interest thereon and all other sums which may be payable under this Loan Agreement the Debtor shall execute and deliver to the Bank or cause to be executed and delivered to the Bank:

9.1 **Mortgages** 

9.1.1 First ranking Italian mortgage (the "First Mortgage") with executory declaration in favour of the Bank over the Newbuilding to be registered under the Italian flag in the Italian Register with the Port Authorities of Naples in the amounts specified under 9.1.4 below.

9.1.2 Second ranking Italian mortgage (the "Second Mortgage") with executory declaration in favour of the Bank over the vessel "RITA D'AMATO", product tanker, 40,000 dwt, built 2004, call sign IBZX, IMO No.:9253129 (the "Collateral Vessel"), owned by the D'Amato, such Second Mortgage to be registered under the Italian flag in the Italian Register with the Port Authorities of Naples in the amount specified under 9.1.4 below and directly ranking after the first ranking Italian mortgage registered at the Harbour Master of Naples in favour of the Bank securing all amounts granted and/or outstanding from time to time (the "Existing Loan") pursuant to a Loan Agreement between D'Amato and the Bank dated 2 October 2003 as amended from time to time (the "Existing Loan Agreement"), and



9.1.3   The First Mortgage over the Newbuilding as per 9.1.1 above and the Second Mortgage over the Collateral Vessel as per 9.1.2 above are together called the "Mortgages".

9.1.4   The Mortgages shall be in form and substance acceptable to the Bank and be registered for the following USD-amounts:

|  | | Newbuilding | Collateral Vessel | |
|---|---|---|---|---|
|  | | | until Delivery | after Delivery |
| - | principal | 30,175,000 | 17,000,000 | 11,000,000 |
| - | interest (as per Clause 9.1.5 hereof) | 6,000,000 | 3,300,000 | 2,200,000 |
| - | legal costs, hedging costs, costs in connection with any Transaction as per Clause 11 hereof, insurance premiums, taxes, charges, debts and foreign exchange risks and other risks of any kind incurred by the Bank and to be reimbursed by the Debtor | 3,000,000 | 1,700,000 | 1,100,000 |
| | totally | 39,175,000 | 22,000,000 | 14,300,000 |

*- USD -*

The USD-amount of the Second Mortgage over the Collateral Vessel will be reduced upon Delivery of the Newbuilding and registration of the First Mortgage over the Newbuilding as indicated above.

9.1.5   The Bank and the Debtor, in conformity with the requirements of Article 576 of the Italian Navigation Code, expressly agree that the extension of the Mortgages is not limited to that of the two (2) years prior to and of the year current at the date of the attachment but includes also one (1) more year at interest.

9.1.6   The Bank and the Debtor in compliance with the requirements of Article 573 of the Italian Navigation Code, expressly agree that the Mortgages will extend to all the income from the freights and the hires of the Newbuilding and the Collateral Vessel.

9.1.7   Nota di Trascrizione will be prepared and deposited with the Bank.

## 9.2   Earnings Assignments

9.2.1   First General Assignment of all earnings of the Newbuilding as per Enclosure 5 hereto.

9.2.2   Amendment to the First General Assignments of Earnings in favour of the Bank relating to the Collateral Vessel as per Enclosure 6 hereto. The Bank shall not give Notice of Assignment as long as the Debtor shall not be under default under this Loan Agreement and the Securities.



13

**9.3    Insurance Assignments**

9.3.1    First Assignment of all claims and monies payable under the relevant insurance policies or protection and indemnity insurances for the Newbuilding as per Enclosure 7 hereto.

9.3.2    Amendment to the First Assignment of Insurances in favour of the Bank relating to the Collateral Vessel as per Enclosure 8 hereto.

9.3.3    The following insurances ("Insurances") with respect to the Newbuilding and/or the Collateral Vessel must be effected and maintained in accordance with normal market practice and at terms and conditions acceptable to the Bank:

9.3.3.1    Hull, Machinery etc., and

9.3.3.2    War risk insurance (hull and P&I) including cover in respect of vandalism, sabotage and malicious mischief as well as the London Blocking and Trapping Addendum, the war P&I cover having a separate limit for the same amounts insured under the war hull cover, and

9.3.3.3    Protection and Indemnity risk insurance in an association approved by the Bank against all protection and indemnity risks with highest available limit of liability (except for the case of oil pollution which shall be covered to the highest limit for the type of the Newbuilding/Collateral Vessel accepted by first class protection and indemnity associations).

9.3.4    (a)The Collateral Vessel to be insured against marine risks and war risks at least in an amount being the greater of (i) its full market value and (ii) 120% of the amount outstanding from time to time under the Existing Loan plus either

-   (until delivery of the Newbuilding) 120% of the amount outstanding from time to time under the Loan, or
-   (after Delivery of the Newbuilding) 120% of one third (1/3) of the amount outstanding from time to time under the Loan.

(b)The Newbuilding to be insured against marine risks and war risks at least in an amount being the greater of (i) its full market value and (ii) 120% of the amount outstanding from time to time under the Loan.

9.3.5    Insurers, Brokers and the P&I Club have to be approved by the Bank.

Should the Debtor/D'Amato not fulfil the instructions of the Bank the Bank is entitled to insure its risk or the Newbuilding/Collateral Vessel at its discretion. It may cover all damages and risks excluded by any policy through an additional insurance.

9.3.6    The Debtor shall (and with respect to the Collateral Vessel, shall ensure that D'Amato will)

(a)  renew the Insurances at least 14 days before the relevant policies or contracts expire and shall procure that the brokers shall promptly



confirm in writing to the Bank as and when each such renewal is effected.

(b) punctually pay all premiums, calls, contributions and other sums payable in respect of the Insurances and shall produce to the Bank all relevant receipts when so required by the Bank.

(c) procure that the brokers shall provide the Bank with certified copies of the Insurances and letters of undertaking / certificates of entry in the standard market form.

(d) not do or permit to be done any act whereby any Insurance may be suspended or avoided, and not suffer or permit any of the Newbuilding or the Collateral Vessel to engage in any voyage nor to carry any cargo not permitted under the Insurances without first covering the respective ship to the amount herein provided for with insurance satisfactory to the Bank.

(e) not - in particular - permit the Newbuilding and/or the Collateral Vessel to enter or trade to any zone which is declared a war zone by any government or by the war risks insurers, unless the Debtor and/or D'Amato has effected at its expense such special insurance as the Bank may require and the Bank has received sufficient evidence from the underwriters of the existence of such insurance cover.

Should the Newbuilding and/or the Collateral Vessel be operated by the Debtor/D'Amato, any operator or charterer within US-territory waters (200 miles zone) or should it be intended to enter any US-harbour then the Debtor/D'Amato is obliged to insure the respective ship against all risks as the Bank deems necessary by first class underwriters (e.g. maximum available oil pollution cover in excess of the oil pollution cover provided by the P&I club, drug seizure etc.).

9.3.7  A "Notice of Assignment" as per Enclosures 9 and a "Loss Payable Clause" as per Enclosure 10 shall be attached to the Hull & Machinery and War Risks Cover Notes and Policies.

9.3.8  In case the Newbuilding and/or the Collateral Vessel is insured under a fleet policy the Bank requires a confirmation from the underwriters that each vessel of the fleet policy is deemed to be a separate unit and that underwriters will not set off any claims of the Newbuilding or the Collateral Vessel against premiums due for other ships under the fleet policy and will not cancel the insurance cover of the Newbuilding or the Collateral Vessel for reason of non-payment of premiums for other ships under the fleet policy.

9.3.9  The Debtor/D'Amato shall give immediate notice to the Bank on any damage to the Newbuilding or the Collateral Vessel in the event that such damage exceeds 10% of the insured value for hull. The Debtor/D'Amato shall repair any damage to the ship without delay. The Bank is entitled at any time to verify or cause to be verified that the damage has been duly repaired. In case the Debtor and/or D'Amato does not comply with his duty to repair the ship the Bank may cause the damage to be repaired. In such event the Debtor and/or D'Amato must provide all possible assistance.

The Bank is entitled at any time to verify or cause to be verified the payments made by the Debtor/D'Amato or the insurer in relation to an



insured event. If requested by the Bank the payments have to be proved by way of production of the receipts. If agreement with the insurers cannot be reached on the merits or the amount of their obligation to pay for the damage the Bank is entitled to reach an agreement with the insurers on a settlement which will be binding for the Debtor and/or D'Amato.

9.3.10 The Debtor shall on first demand reimburse the Bank for all costs and expenses paid or incurred by the Bank with respect to a Mortgagee's Interest Additional Perils (Pollution) Insurance and a Mortgagees' Interest Insurance each in an amount equal to one hundred and ten per centum (110%) of the relevant principal amount outstanding under the Loan.

## 9.4 Newbuilding Contract and Refund Guarantee Assignments

First priority Assignment of the Newbuilding Contract and first priority Assignment of the refund guarantee (to be in form and substance acceptable to the Bank - the "Refund Guarantee") for the Contract Instalments No. 1 to 4 of the Newbuilding Contract, issued by The Bank of China - Beijing (the "Refund Guarantor") as per Enclosure 11 hereto.

## 9.5 Personal Guarantee

Unconditional and irrevocable guarantee (the "Personal Guarantee") of Capt. Michele D'Amato (the "Personal Guarantor") as per Enclosure 12 hereto. Such Personal Guarantee to be limited to USD 1,500,000.

## 9.6 Corporate Guarantee

Unconditional and irrevocable corporate guarantee (the "Corporate Guarantee") of D'Amato as per Encl. 13 hereto.

## 9.7 Acknowledgement



Duly notarized Acknowledgement of Debt by the Debtor as per Enclosure 14 hereto to be received by the Bank not later than 3 months after the Delivery Date of the Newbuilding.

The security documents as per Clause 9.1 to 9.7 are together called "the Securities". The Securities shall be in such form and shall contain such terms and conditions as set out herein and as shall be required by the Bank in accordance with established standards with first class borrowers.

## 10. SWAP OPTION

The Bank hereby agrees that the Debtor shall have the right to request that the balance of principal outstanding under the Loan - the "Initial Amount" - is swapped into an alternative currency acceptable to the Bank - the "Alternative Currency" - for the next Interest Period to the effect that the Loan will be continued for such Period in the Alternative Currency provided that



16

10.1 there is no event of default under this Loan Agreement and the Securities.

10.2 the Alternative Currency shall be a currency in respect of which there is at all relevant times a London Interbank Offered Rate and an exchange rate.

10.3 the Bank shall receive written notice to swap the Loan into an Alternative Currency not later than six (6) Business Days prior to drawdown of the Loan or three (3) Business Days prior to commencement of any Interest Period.

10.4 the Swap Option shall only be exercised by the Debtor with reference to a specific Interest Period and the effects of such exercise will be each time limited to the relevant Interest Period.

10.5 any Interest Period for which the Debtor has exercised the Swap Option shall expire on the date for payment of any ordinary repayment instalment pursuant to Clause 6 hereof.

10.6 the Debtor for the period during which the Loan is continued in an Alternative Currency pursuant to this Clause 10 shall hedge the Alternative Currency against the risk from exchange rate fluctuations between the Initial Amount and the Alternative Currency. Such hedging transactions have to be effected with and acceptable to the Bank in its sole discretion. All costs of the hedging are to be borne by the Debtor on first demand of the Bank.

10.7 the Bank shall notify the Debtor in writing of the exact amount next due as soon as possible after the time prescribed for notification of the Debtor of the Alternative Currency in which the Loan is to be denominated for the next following Interest Period.

10.8 upon occurrence of an event of default the Bank may require under the Securities the payment in USD of the Initial Amount plus interest and costs and not in the Alternative Currency as specified.

10.9 the Debtor shall execute or procure the execution of such further document as the Bank may reasonably require from time to time in consequence of the implementation of the terms of this Swap Option in order to preserve and maintain the validity of the Securities as full security for the Loan. ·

11. **FINANCIAL DERIVATIVES TRANSACTIONS**

11.1 The Bank and the Debtor may from Delivery Date onwards during the term of the Loan enter into one or more transactions in order to manage interest rate risks (each of them hereinafter the "Transaction") as described i. a. together with other financial derivatives transactions (which are - for clarification purposes - not available for the Debtor in connection with this Loan Agreement) in the "Rahmenvertrag für Finanztermingeschäfte" (the "Master Agreement") as per Enclosure 15a (an English



translation of the Master Agreement is attached as Enclosure 15b; the German text alone is authoritative). The terms and conditions of each Transaction will be specified in a confirmation sent by the Bank to the Debtor.

Any such Transaction is in the sole and absolute discretion of the Bank.

11.2 The aggregate notional amount of the Transactions entered into shall always be equal to the amount of the Loan actually outstanding and therefore shall be adjusted by the Bank

    11.2.1   on each due date of a repayment instalment as well as

    11.2.2   every time the Debtor prepays part of the loan.

The Debtor for this purpose irrevocably authorises the Bank to amend, restructure, terminate or assign any of its rights and/or obligations created pursuant to the Master Agreement.

11.3 The Debtor will indemnify the Bank from time to time on demand in respect of all liabilities, losses, costs or expenses suffered, incurred or sustained by the Bank arising in any way in relation to the exercise by the Bank of its rights under this clause (or in any other way) together with interest at the Default Rate thereon.

11.4 The Debtor shall not assign, novate or in any other way transfer any of its rights or obligations under any Master Agreement nor enter into any interest rate exchange or hedging agreement with anyone other than the Bank, nor any other agreement or commitment the effect of which is - in the opinion of the Bank - materially to prejudice the hedging of the Debtor's interest rate risk effected by any Transaction from time to time entered into between the Debtor and the Bank.

## 12.  **PAYMENTS MANDATORY PREPAYMENT RESERVE REQUIREMENTS AND ILLEGALITY**

12.1 All moneys payable under the Loan Agreement and the Securities shall be paid to such account or accounts at such bank or banks as the Bank may from time to time direct in the currency or currencies in which the Loan is at any time denominated in accordance with the terms of this Loan Agreement in same day funds and shall be deemed to have been received by the Bank on the date on which the Bank receives duly authenticated advice of receipt of such monies provided that if such advice is received by the Bank on a day other than a Business Day or at a time of day outside normal banking hours in the Federal Republic of Germany such monies shall be deemed to have been received by the Bank on the Business Day next following the date of receipt of such advice by the Bank.

12.2 "Taxes" in this clause shall include all levies, imposts, duties, charges, fees, deductions and withholdings and any restrictions or conditions resulting in any charge except for taxes on the overall net income of the Bank.



18

12.3 All payments (whether of principal or interest or otherwise) to be made by the Debtor pursuant to the Loan Agreement and the Securities shall be made free and clear of and without deduction for or on account of any taxes or other deductions, withholdings, restrictions or conditions of any nature. If at any time any applicable law requires (or is construed so as to require) the Debtor to make any such deduction or withholding from any such payment the amount due from the Debtor in respect of such payment shall be increased to the extent necessary to ensure that after the making of such deduction or withholding the Bank receives a net sum equal to the sum which it would have received had no deduction or withholding been made provided that nothing therein contained shall impose any liability of the Debtor for taxes on the overall net income of the Bank. The Debtor shall indemnify the Bank against any liability of the Bank in respect of such Taxes.

12.4 If any payment to be made under the Loan Agreement and the Securities other than a repayment instalment or a payment of interest of the Loan shall be due on a day which is not a Business Day such payment shall be made on the next succeeding Business Day (unless such day falls in the next calendar month in which event such payment shall be made on the next preceding business day) and any such variation of time shall be included in computing any interest in respect of such payment.

12.5 If no date is specified for the payment by the Debtor of any amount payable by it under the Loan Agreement and the Securities, the Debtor shall make such payment within five (5) Business Days of the Bank's demand therefore.

12.6 If by reason of the introduction of any law or any change in any law or the interpretation or administration thereof or in compliance with any request or requirement from any central bank or any fiscal, monetary or other authority:

12.6.1 the Bank (which shall for the purpose of this Clause include any permitted assignee or transferee of the Bank) shall be subject to any tax with respect to payments of all or any part of the Total Loan and interest thereon; or

12.6.2 the basis of taxation of payments to the Bank in respect of all or any part of the Total Loan and interest thereon (except for taxes on the overall net income of the Bank) shall be changed; or

12.6.3 any reserve requirements shall be imposed, modified or deemed applicable against assets held by or deposits in or for the account of or loans by the Bank; or

12.6.4 the manner in which the Bank allocates capital resources to its obligations under this Loan Agreement or any ratio (whether cash, capital adequacy, liquidity or otherwise) which the Bank is required or requested to maintain shall be affected; or

12.6.5 there is imposed on the Bank with respect to the Total Loan (or any part thereof) and interest thereon or the Securities any other condition;

and the result of any of the foregoing shall be to increase the costs to the Bank of making or maintaining the Total Loan, or cause the Bank to suffer (in its opinion) a material reduction in the rate of return on its overall capital below the level which it reasonably anticipated at the date of this Loan Agreement and which it would have



been able to achieve but for its entering into this Loan Agreement and/or performing its obligations under this Loan Agreement, then the Bank shall inform the Debtor thereof as soon as reasonably practicable and upon demand being made to the Debtor by the Bank the Debtor shall pay to the Bank that amount which shall compensate the Bank for such additional costs or reduced return. However nothing herein contained shall impose any liability on the Debtor for taxes on the overall net income of the Bank.

The Bank will negotiate with the Debtor in good faith with a view to minimize or eliminate such additional costs or reduced return.

12.7  Notwithstanding anything herein contained the obligation of the Bank to make or maintain the Total Loan (or any part thereof) shall terminate in the event that a change in any applicable law or regulation or in the interpretation thereof by any authority charged with the administration thereof shall make it unlawful for the Bank to maintain or give effect to its obligation to make or maintain the Total Loan. In such event the Bank shall by written notice to the Debtor declare that the Bank's obligations shall be terminated forthwith and the Total Loan, interest thereon and all costs and expenses connected therewith shall be repaid within thirty (30) days from the date of such notice and the amount so repaid shall not be capable of being reborrowed.


## 13.  MAINTENANCE OF SECURITY

13.1  In the event that

13.1.1  during the period from the date of this Loan Agreement until the Delivery Date of the Newbuilding the Market Value of the Collateral Vessel shall fall to a point where such Market Value shall be less then one hundred per cent (100%) of the aggregate of the Loan plus the Existing Loan plus the Guaranteed Amount (as long as applicable),or

13.1.2  from the Delivery Date of the Newbuilding onwards the Market Value of the Newbuilding shall fall to a point where such Market Value shall be less then one hundred and ten per cent (110%) of the Loan

then in such event the Debtor will within thirty (30) days at the request of the Bank pay to the Bank a cash deposit in the amount of such deficit to be held by the Bank as additional security for the repayment of the Loan interest thereon and any other moneys payable hereunder or give additional security acceptable to the Bank for such deficit.

13.2  "Market Value" shall mean the charterfree market value of the Newbuilding or the Collateral Vessel (as applicable) being the average from the valuations (at the Debtor's expense) of two international brokers one of them appointed by the Bank and the other by the Debtor.

13.3  If the Market Value is determined in a different currency than the amount outstanding under the Loan and/or the Existing Loan, then the ratio as per Clause 13.1 shall be calculated on the basis of the rate of exchange prevailing on the day of the calculation, as conclusively determined by the Bank.



## 14. ASSIGNMENT

14.1 The Debtor may not assign or transfer all or any of its rights, benefits and obligations hereunder without the prior written consent of the Bank.

14.2 The Bank shall have the right at any time and from time to time to syndicate or assign the Loan or any part of the Loan and to bring another participant and for this purpose to transfer in part the rights and/or the obligations of the Bank under this Agreement to such assignee and/or participant provided, however, that if the intended assignee or participant is not a member, subsidiary or affiliate of the Bank's group it shall first obtain the approval of the Debtor to such assignee or participant (such approval not to be unreasonably withheld) and the Debtor hereby covenants to enter into whatever additional documentation which may be required for this purpose. Such documentation shall be prepared at the expense of the Bank

14.3 The Bank may disclose to a potential assignee, participant or to any person who may otherwise enter into contractual relations with the Bank in relation to this Agreement such information about the Debtor and/or D'Amato as the Bank shall consider appropriate.

## 15. MISCELLANEOUS

15.1 The Debtor shall not permit the Newbuilding to be delivered into service under any charterparty or other contract of employment exceeding a period of 5 (five) months without prior to that the Debtor having received written confirmation from the Bank that the Mortgage has been registered against the Newbuilding, unless the charterer has previously delivered to or to the order of the Bank written confirmation in form and substance acceptable to the Bank subordinating any maritime lien which the charterer may have or acquire against the Newbuilding to the rights of the Bank as mortgagee.

15.2 Commercial management for the Newbuilding and the Collateral Vessel as well as technical management for the Newbuilding to be provided by D'Amato. Technical management for the Collateral Vessel to be provided by D'Amico Societa di Navigazione ("D'Amico"). No change of management without the prior written consent of the Bank. D'Amico and any new managers to sign an undertaking as per Enclosure 16 subordinating all their rights against the Debtor/D'Amato and the Collateral Vessel/Newbuilding to those of the Bank.

15.3 The Debtor and D'Amato shall deliver to the Bank as soon as approved by its Collegio Sindacale and without being requested the audited accounts as per IAS in EUR and in English (also on consolidated basis) together with the profit and loss account as well as explanatory comments within eight months after the end of the respective financial year at the latest.

Further the Debtor and D'Amato shall deliver to the Bank all such other financial information as the Bank may from time to time require.



15.4 The attached General Loan Conditions (Enclosure 17) shall be applicable and form part of this Loan Agreement.

15.5 In addition to the events of default listed in clause IV. (1) of the General Loan Conditions it shall constitute an event of default if

15.5.1 the repayment or any repayment instalment of the Loan or amount of interest on the Loan is not paid and this default shall have been unremedied for fourteen (14) days after written notice shall have been given to the Debtor by the Bank and/or

15.5.2 any of the Transactions and/or the Master Agreement as per Clause 11 hereof is for any reason terminated, cancelled or otherwise ceases to remain in full force and effect and/or

15.5.3 the Debtor is entitled to make a demand under the Refund Guarantee but fails to make such demand when requested so to do by the Bank, and/or

15.5.4 the Seller makes demand for payment under the Performance Guarantee, or if the Performance Guarantee has not expired until 30.06.2008, and/or

15.5.5 any event of default under the Existing Loan Agreement and/or the Securities defined therein occurs, and/or

15.5.6 the Bank has not received by 30 June 2007 the acceptable evidence as per Clause 3.5.2 hereof, and/or

15.5.7 any other indebtedness or obligation for borrowed money of the Debtor, D'Amato and/or the Personal Guarantor becomes due or capable of being declared due prior to its stated maturity by reason of default of the Debtor, D'Amato and/or the Personal Guarantor, or is not repaid or satisfied at maturity (provided that this provision shall not apply in relation to indebtedness or borrowed money which the Bank does not consider material) and/or D'Amato or the Personal Guarantor does not comply with any provision of any material document to which he is a party.

Should any of these events of default occur then the Bank shall be entitled to cancel the Loan and to claim immediate repayment of the Loan, interest thereon and all costs and expenses connected therewith. The Debtor acknowledges that the Bank shall be under no obligation to make any payment to the Debtor under or pursuant to the Master Agreement if there shall have occurred an event of default.

15.6 The Debtor shall not, without the prior written consent of Bank (which shall not be unreasonably withheld) enter into freight derivatives (or other instruments which have the effect of hedging forward exposure to freight derivatives; "FFAs") only as hedging instrument for the Newbuilding and shall submit to the Bank on quarterly basis and in writing all information requested from the Bank on all FFAs which the Debtor has entered into.

15.7 Any material change of the terms and conditions of the Newbuilding Contract shall require the prior written consent of the Bank.



22

15.8 No failure or delay on the part of the Bank to exercise any power or right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise by the Bank of any such power or right preclude any other or further exercises thereof or the exercise of any other right.  The remedies provided herein are cumulative and not exclusive of any remedies provided by law.

15.9 Any and all expenses concerning, deriving from and consequent to this Loan Agreement and to any Security and all additional costs incurred by the Bank in relation to the Performance Guarantee (including correspondent bank charges), as well as any expenses and charges in general, even those of tax nature which the Bank may at present or in the future incur in connection with this Loan Agreement the Securities the Performance Guarantee and any other documents connected therewith and with the registration and execution of the same, shall be borne by the Debtor which shall furnish the Bank with the funds necessary to afford those expenses or to reimburse any amount already paid by the Bank on first demand.

15.10 The Bank will commission their solicitors Studio Legale Castaldo, Via A. Depretis, 114, 80133 Naples, Italy with the preparation and establishing of the Securities, as well as the supervision of the effective signing of all documents required.  Further the Bank elects the said Studio Legale Castaldo as its address for service in Italy. Pursuant to Article 569 b) of the Italian Code of Navigation, the Bank elects domicile c/o Studio Legale Castaldo, Via A. Depretis, 114, 80133 Naples, Italy.  Costs incurring within the scope of the commission are to be borne by the Debtor.

15.11 All supporting documents required by the Bank are to be delivered to the Bank in German or English language or with translation into one of these languages.

15.12 Any and all declarations and notices pursuant to and in connection with this Loan Agreement shall be sent (i) in case of the Bank to its address at the head of this Agreement (fax-no. +49 421 32 35 39) and (ii) in case of the Debtor to its address at the head of this Agreement (fax-no. 0039 081 551 1420).

## 16.   LAW AND PLACE OF JURISDICTION

This Loan Agreement shall be governed by and interpreted under German law. However, for the Mortgages, the Personal Guarantee, the Corporate Guarantee and the Acknowledgement of Debt referred to in Clause 9 hereof, Italian law shall apply.

Place of jurisdiction is Bremen/Federal Republic of Germany, however, the Bank reserves the right to choose as place of jurisdiction any place where the Newbuilding or the Collateral Vessel is situated or the Debtor's, D'Amato's place or any place of the Debtor's branch office.

Otherwise all terms and conditions shall apply which shall be contained in the Securities and which terms and conditions shall be deemed to be incorporated herein, however, this Loan Agreement shall prevail in case of inconsistency.



**IN WITNESS** of which the parties hereto have executed this Loan Agreement the day and year first before written.

**Deutsche Schiffsbank**
**Aktiengesellschaft**

(as Bank)

**Gorgonia di**
**Navigazione S.p.A.**

(as Debtor)

**Roll of Deeds No.  796/2006**

I, the undersigned Notary Public **Reinhard Schale** with official place of residence at Bremen, herewith publicly certify the signatures made before me on the attached Loan Agreement by

1) Mr. Lars Bohlig,

    born 04.07.1964,

    having his private address at Heinrich-Heine-Straße 65, 28211 Bremen,

2) Mr. Malte Schulte-Trux,

    born on 02.02.1968,

    having his private address at Buchard-Eden-Straße 5, 28213 Bremen,

    - both personally known to me -

3) Mr. Umberto D'Amato,

    born 06.09.1974,

    having his private address at Sedivola 33 i.11, 80059 Torre del Greco, Italy,

    - identified by his italian identity card No. AM 3482483 -

Mr. Umberto D'Amato according to his statement is acting for and on behalf of Gorgonia di Navigazione S.p.A. with domicile at Naples, Italy, as Debtor pursuant to power of attorney ("Procura") Original of which was presented to me and certified true copy of which is attached hereto.

Mr. Lars Bohlig and Mr. Malte Schulte-Trux according to their statements are acting for and behalf of Deutsche Schiffsbank Aktiengesellschaft with domicile at Bremen and Hamburg.

Having today inspected the Commercial Register of the Amtsgericht (Lower Court) of Bremen I herewith publicly certify that

a)    Mr. Lars Bohlig

b)    Mr. Malte Schulte-Trux

are registered in the Commercial Register as holders of powers of procuration, authorized to jointly represent and bind Deutsche Schiffsbank Aktiengesellschaft with domicile at Bremen and Hamburg.

Prior to the notarisation of their signatures the acting Notary Public has asked the signatories, whether he or any person professionally connected with him is or has been acting in the matter, which is the object of this notarisation in any other capacity than in notarial function. This question has been answered to the negative.

Witness my hand and seal.

Bremen, September 2?, 2006



Notary Public

**Bill of Costs**

| | | | | |
|---|---|---|---|---|
| Value | > € | 310.000,00 | | |
| Fee | §§ | 141, 32, 45 KostO | € | 130,00 |
| Fee | § | 150 I KostO | € | 13,00 |
| Fee | § | 55 KostO | € | 10,00 |
| Turnover tax 16 % | | | € | 24,48 |
| | | | € | 177,48 |

Notary Public:

Certified true copy

## PROCURA

La società "Gorgonia di Navigazione S.p.A." (d'ora innanzi definita "la Società") con sede in Napoli alla Via Giovanni Porzio n. 4 Centro direzionale isola G/2, capitale versato euro 500.000,00, codice fiscale e numero Registro Imprese di Napoli, 06849660631, in persona di Michele D'Amato, nato a Torre del Greco (NA) l'1 novembre 1938, nella sua qualità di Amministratore Unico e legale rappresentante, domiciliato per la carica presso la predetta sede sociale, nomina e costituisce D'Amato Umberto, nato a Napoli il 6 settembre 1974 (Carta di Identità N° AM 3482483 rilasciata dal Comune di Torre del Greco il 13 settembre 2005 ) (d'ora innanzi "il Procuratore") e/o qualsiasi altra persona da quest'ultimo espressamente nominata per iscritto, quali suoi procuratori speciali, conferendo loro i più ampi poteri di fare, compiere e sottoscrivere, congiuntamente o disgiuntamente, i seguenti atti:

1. concordare termini e condizioni e firmare e sottoscrivere in nome e per conto della Società un contratto di finanziamento ("il Contratto di Finanziamento") con la Deutsche Schiffsbank Aktiengesellschaft, con sede in Domshof 17, D-28195 Brema (Germania) ("la Banca") attraverso cui la Banca concederà in favore della Società un finanziamento per l'importo complessivo non superiore a USD 30.175.000 ("il Finanziamento"), ed una garanzia da rilasciarsi in favore dei cantieri cinesi China Shipbuilding Trading Company Ltd. e Hudong-Zhonghua Shipbuilding (Group) Co. Ltd., (insieme definiti " il Cantiere") per l'importo massimo garantito di USD 3.550.000 ("la Performance Guarantee"). Finanziamento e garanzia finalizzati a consentire alla

1

Società l'acquisto dal Cantiere della nuova costruzione (Scafo n. H1516A) ("la Nave") di cui al contratto di costruzione del 28 marzo 2006 ("il Contratto di Costruzione");

2. Esercitare i diritti e i poteri della Società e eseguire le altre obbligazioni e responsabilità derivanti dal Contratto di Finanziamento.

3. Concordare i termini e le condizioni e firmare e sottoscrivere, per garantire l'indicato finanziamento:

a) La Cessione Generale ("First General Assignment") di tutti i profitti della Nuova Costruzione a favore della Banca, nel rispetto dei termini e delle condizioni stabilite da quest'ultima.

b) La Prima Cessione ("First Assignment of Insurances") in favore della Banca di tutte le richieste di indennizzi e di tutti i pagamenti dovuti secondo le relative polizze assicurative della Nuova Costruzione, secondo i termini e le modalità stabilite dalla Banca;

c) tutti gli altri accordi, strumenti o atti di qualsiasi natura che saranno necessari o ritenuti idonei a tal fine dalla Banca.

3.2 Firmare e sottoscrivere le Richieste di Messa a Disposizione dei Fondi e/o Avvisi di Rinnovo.

3.3 Nominare o revocare Procuratori a loro discrezione.

3.4 Firmare e sottoscrivere tutti quei documenti e compiere tutti quegli altri atti di qualsiasi natura che potranno essere necessari a discrezione dei citati Procuratori per portare a termine gli scopi di cui alla presente procura con facoltà di nominare o revocare sostituti.

3.5 Firmare o sottoscrivere quegli altri documenti che si rendessero necessari e apporre quelle modifiche che la Banca potrà richiedere dopo

2

la loro sottoscrizione e che potranno essere necessarie ad opinione del procuratore che li sottoscrive e compiere ogni altro atto e completare quegli altri documenti e negozi che potranno essere considerati necessari dai procuratori per un migliore e più veloce raggiungimento degli scopi di cui alla presente procura con facoltà di nominare sostituti.

La Società si impegna a ratificare e confermare qualsiasi atto che il Procuratore e/o i procuratori sostituenti potranno compiere in virtù della presente Procura.

La presente Procura è irrevocabile per il periodo di un mese da oggi, e si esaurirà in un unico contesto.

Napoli addì 27 settembre 2006

N. 119301          del Repertorio

L'anno duemilasei, il giorno ventisette del mese di settembre in Napoli alla Piazza Bovio n.ro 22

CERTIFICO

io sottoscritto Dott. NICOLA CAPUANO, Notaio residente in Napoli, con studio alla via Depretis n.ro 5, iscritto nel Ruolo dei Distretti Notarili Riuniti di Napoli, Torre Annunziata e Nola, che la soprascritta firma è autografa del signor Michele D'Amato, nato a Torre del Greco (NA) l'1 novembre 1938, nella qualità di Amministratore Unico e legale rappresentante della società "Gorgonia di Navigazione S.p.A.", con sede in Napoli alla Via Giovanni Porzio n. 4 Centro direzionale isola G/2, capitale versato euro 500.000,00, codice fiscale e numero Registro Imprese di Napoli, 06849660631, domiciliato per la carica presso la sede

3

sociale, della cui identità personale io Notaio sono certo e che la stessa è
stata apposta in mia presenza.

I herewith publicly certify this
copy to be a true copy of the
original.

Bremen, SEP 29. 2006

Notary Public

4

## Schedule of Enclosures

| No. | | page |
|---|---|---|
| 1 | Performance Guarantee | 2 |
| 2a | Performance Guarantee Issue Request | 4 |
| 2b | Drawdown Notice | 5 |
| 3 | Renewal Notice | 7 |
| 4 | Repayment Schedule | 10 |
| 5 | Assignment of Earnings (Newbuilding) | 12 |
| 6 | Amendment to Earnings Assignment (Coll. Vessel) | 12 |
| 7 | Assignment of Insurances (Newbuilding) | 13 |
| 8 | Amendment to Insurances Assignment (Coll. Vessel) | 13 |
| 9 | Notice of Assignment | 14 |
| 10 | Loss Payable Clause | 14 |
| 11 | Assignment of Newbuilding Contract / Refund Guarantee | 15 |
| 12 | Personal Guarantee | 15 |
| 13 | Corporate Guarantee | 15 |
| 14 | Acknowledgement | 15 |
| 15a | Master Agreement | 16 |
| 15b | Translation of Master Agreement | 17 |
| 16 | Managers' Undertaking | 20 |
| 17 | General Loan Conditions | 21 |

**Enclosure 1**

## **FORM OF PERFORMANCE GUARANTEE**

IRREVOCABLE LETTER OF GUARANTEE FOR THE 2ND INSTALMENT

_____

_____ Bank

To:    China Shipbuilding Trading Co., Ltd., Date: _____
       56 (Yi) Zhongguancun Nan Da Jie, Beijing
       100044, the People's Republic of China

Dear Sirs,

(1)  In consideration of your entering into a Ship Sale Contract dated _____ ("the Shipbuilding Contract") with _____ as the buyer ("the BUYER") for the construction of one (1) _____ Metric Tons Deadweight _____ known as _____ Shipyard's Hull No. _____("the VESSEL"), we, _____, hereby IRREVOCABLY, ABSOLUTELY and UNCONDITIONALLY guarantee, as the primary obligor and not merely as the surety, the due and punctual payment by the BUYER of each and all of the 2nd instalment of the Contract Price amounting to a total sum of United States Dollars _____ as specified in (2) below.

(2)  The Instalment guaranteed hereunder, pursuant to the terms of the Shipbuilding Contract, comprise the 2nd instalment in the amount of U.S. Dollars _____ payable by the BUYER within three (3) New York banking days after cutting of the first steel plate in your BUILDER's workshop.

(3)  We also IRREVOCABLY, ABSOLUTELY and UNCONDITIONALLY guarantee, as primary obligor and not merely as surety, the due and punctual payment by the BUYER of interest on the 2nd Instalment guaranteed hereunder at the rate of Six Point Five percent (6.5%) per annum from and including the first day after the date of instalment in default until the date of full payment by us of such amount guaranteed hereunder.

(4)  In the event that the BUYER fails to punctually pay the 2nd Instalment guaranteed hereunder or the BUYER fails to pay any interest thereon, and any such default continues for a period of fifteen (15) days, then, upon receipt by us of your first written demand, we shall immediately pay to you or your assignee the unpaid 2nd instalment, together with the interest as specified in paragraph (3) hereof, without requesting you to take any or further action, procedure or step against the BUYER or with respect to any other security which you may hold.

(5)  We hereby agree that at your option this Guarantee and the undertaking hereunder shall be assignable to and if so assigned shall inure to the benefit of any 3rd party designated by you or Bank of China, Head Office, Banking Department, Beijing, the People's Republic of China as your assignee as if any such third party or Bank of China, Head Office, Banking Department, Beijing, the People's Republic of China were originally named herein.

1

(6) Any payment by us under this Guarantee shall be made in United States Dollars by telegraphic transfer to Bank of China, New York Branch, 415 Madison Avenue, New York, N.Y. 10017 USA, as receiving bank nominated by you for credit to the account of you with Bank of China, Head Office, Banking Department, Beijing, the People's Republic of China or through other receiving bank to be nominated by you from time to time, in favour of you or your assignee.

(7) Our obligations under this guarantee shall not be affected or prejudiced by any dispute between you as the SELLER and the BUYER under the Shipbuilding Contract or by the BUILDER's delay in the construction and/or delivery of the VESSEL due to whatever causes or by any variation or extension of their terms thereof or by any security or other indemnity now or hereafter held by you in respect thereof, or by any time or indulgence granted by you or any other person in connection therewith, or by any invalidity or unenforceability of the terms thereof, or by any act, omission, fact or circumstances whatsoever, which could or might, but for the foregoing, diminish in any way our obligations under this Guarantee.

(8) Any claim or demand shall be in writing signed by one of your officers and may be served on us either by hand or by post and if sent by post to _____ (or such other address as we may notify to you in writing), or by tested telex (telex no.: _____) via Bank of China, with confirmation in writing.

(9) This Letter of Guarantee shall come into full force and effect upon delivery to you of this Guarantee and shall continue in force and effect until the VESSEL is delivered to and accepted by the BUYER and the BUYER shall have performed all its obligations for taking delivery thereof or until the full payment of the 2nd Instalment together with the aforesaid interests by the BUYER or us, whichever first occurs.

(10) The maximum amount, however, that we are obliged to pay to you under this Guarantee shall not exceed the aggregate amount of US Dollars Three Million Five Hundred Eighty Eight Thousand Four Hundred Fifty Eight and Cents Thirty Three only (USD 3,588,458.33) being an amount equal to the sum of:

   (a) the 2nd instalments guaranteed hereunder in the total amount of United States Dollars Three Million Five Hundred Fifty Thousand only (USD 3,550,000.00); and

   (b) Interest at the rate of Six Point Five percent (6.5%) per annum on the Instalment for a period of sixty (60) days in the amount of United States Dollars Thirty Eight Thousand Four Hundred Fifty Eight and Cents Thirty Three only (USD 38,458.33).

(11) All payments by us under this Guarantee shall be made without any set-off or counterclaim and without deduction or withholding for or on account of any taxes, duties, or charges whatsoever unless we are compelled by law to deduct or withhold the same. In the latter event we shall make the minimum deduction or withholding permitted and will pay such additional amounts as may be necessary in order that the net amount received by you after such deductions or withholdings shall equal the amount which would have been received had no such deduction or withholding been required to be made.

2

(12) This Letter of Guarantee shall be construed in accordance with and governed by the Laws of England. We hereby submit to the non-exclusive jurisdiction of the English courts for the purposes of any legal action or proceedings in connection herewith in England.

(13) This Letter of Guarantee shall have expired as aforesaid, you will return the same to us without any request or demand from us.

(14) IN WITNESS WHEREOF, we have caused this Letter of Guarantee to be executed and delivered by our duly authorized representative the day and year above written.

Very truly yours

By: _____

**Enclosure 2a**

## FORM OF PERFORMANCE GUARANTEE ISSUE REQUEST

To:        Deutsche Schiffsbank AG, Bremen

From:     Gorgonia di Navigazione S.p.A., Naples/Italy

Dear Sirs,

Performance Guarantee Issue Request

We refer to the Loan Agreement dated .... September 2006 made between you as Bank and us ("the Loan Agreement") in connection with (a) a Loan of up to USD 30,175,000 and (b) a Performance Guarantee of up to USD 3,550,000.

Words and phrases defined in the Loan Agreement shall have the same meaning when used in this Performance Guarantee Issue Request.

Pursuant to Clause 3 of the Loan Agreement we hereby irrevocably request the issue of the Performance Guarantee in the form attached hereto as follows:

1.  Amount of Performance Guarantee:

2.  Performance Guarantee issue date:

3.  Expiry Date of the Performance Guarantee:

4.  Delivery instructions:

We hereby represent and warrant that:

(a)      all conditions precedent to the issue of the Performance Guarantee will have been satisfied on or before the issue date requested herein; and

(b)      no event of default nor any event which would, with the giving of notice and/or the passage of time and/or the satisfaction of any materiality test has occurred and is continuing; and

(c)      no event of default will result from your issuing the Performance Guarantee.

dated                    2006

                                    Yours faithfully,

                                    Gorgonia di Navigazione S.p.A.

**Enclosure 2b**

## FORM OF DRAWDOWN NOTICE

To:      Deutsche Schiffsbank AG, Bremen

From:    Gorgonia di Navigazione S.p.A., Naples/Italy

Dear Sirs,

### Notice of Drawing

We refer to the Loan Agreement dated ................. 2006 made between you as Bank and us ("the Agreement").

Words and phrases defined in the Agreement shall have the same meanings when used in this Drawdown Notice.

Pursuant to Clause 3 of the Loan Agreement we hereby irrevocably request that you

> advance to us Drawing No. ... (as a part of the Loan) in the amount of USD ...................................
> on ................... 2006, which is a Business Day, by paying the said sum plus the Equity Portion for this Drawing No. .... of USD .....................
> to: ...........................................................


We hereby warrant that:

(a)      all conditions precedent to the drawdown of Drawing No. ... will have been satisfied on or before the drawdown date requested therein; and

(b)      no event of default nor any event which would, with the giving of notice and/or the passage of time and/or the satisfaction of any materiality test has occurred and is continuing; and

(c)      no event of default will result from your advancing the Drawing No. ....


We

(a)      select an Interest Period of...... months/ until ..................... as first Interest Period,

(b)      request you to swap the Loan currency into.................pursuant to the Swap Option as per Clause 10 of the Loan Agreement.

dated                    2006

                                        Yours faithfully,


                              Gorgonia di Navigazione S.p.A.

**Enclosure 3**

## FORM OF RENEWAL NOTICE

To:      Deutsche Schiffsbank AG, Bremen

From:    Gorgonia di Navigazione S.p.A., Naples/Italy

**Loan Agreement dated.............  2006**

We refer to the above mentioned Loan Agreement and

(a)      select an Interest Period of .................. months as next Interest Period for the Loan,

(b)      request you to swap the Loan currency into.................... pursuant to the Swap Option
         as per Clause 10 of the Loan Agreement.

dated                    200...

                                        Yours faithfully,


                                        Gorgonia di Navigazione S.p.A.

**Enclosure 4**

## "Newbuilding H1516A"
### Redemption Schedule

### - USD -

| Instalment No. | Due Date* | Repayment Instalment | Balance outstanding** |
|:---:|:---:|:---:|:---:|
|  |  |  | 30.175.000,00 |
| 1 | 6 _12|08_ | 760.000,00 | 29.415.000,00 |
| 2 | 12 _6|09_ | 760.000,00 | 28.655.000,00 |
| 3 | 18 _12|09_ | 760.000,00 | 27.895.000,00 |
| 4 | 24 _6|10_ | 760.000,00 | 27.135.000,00 |
| 5 | 30 _12|10_ | 915.000,00 | 26.220.000,00 |
| 6 | 36 | 915.000,00 | 25.305.000,00 |
| 7 | 42 | 915.000,00 | 24.390.000,00 |
| 8 | 48 | 915.000,00 | 23.475.000,00 |
| 9 | 54 | 1.075.000,00 | 22.400.000,00 |
| 10 | 60 | 1.075.000,00 | 21.325.000,00 |
| 11 | 66 | 1.075.000,00 | 20.250.000,00 |
| 12 | 72 | 1.075.000,00 | 19.175.000,00 |
| 13 | 78 | 1.230.000,00 | 17.945.000,00 |
| 14 | 84 | 1.230.000,00 | 16.715.000,00 |
| 15 | 90 | 1.230.000,00 | 15.485.000,00 |
| 16 | 96 | 1.230.000,00 | 14.255.000,00 |
| 17 | 102 | 1.380.000,00 | 12.875.000,00 |
| 18 | 108 | 1.380.000,00 | 11.495.000,00 |
| 19 | 114 | 1.380.000,00 | 10.115.000,00 |
| 20 | 120 | 10.115.000,00 | 0,00 |
|  |  | 30.175.000,00 |  |

*)   months after Delivery Date

**) after payment of the Repayment Instalment

## **FIRST GENERAL ASSIGNMENT OF EARNINGS**

We, Gorgonia di Navigazione S.p.A., Naples/Italy (hereinafter called the "Owner"), being the buyer and becoming the duly registered owners of the "..................................." (ex Newbuilding No. H1516A; hereinafter called the "Vessel") hereby assign irrevocably and absolutely to

Deutsche Schiffsbank AG, Bremen/Germany,

(hereinafter called the "Lender")

all rights, title and interest in and to:

(a)  all freights hire moneys requisition for hire compensation demurrage detention moneys and all and every other earnings now being earned or due or accruing or at any time during the existence of this security to be earned or become due or in the course of being earned or accruing to, or by the Vessel under any charter or contract of employment entered into with regard to the Vessel or otherwise howsoever or as a result of any requisition for use of the Vessel and

(b)  all claims for damages arising out of breach of any rights to terminate any charter or contract of employment.

This Assignment in favour of the Lender serves as collateral security for the due repayment of the Loan, granted by the Lender in accordance with the terms and conditions of the Loan Agreement dated ......September 2006 between the Owner and the Lender (the "Loan Agreement") and the payment of all other moneys (including but not limited to interest and costs) being due or to become due and payable under the Loan Agreement and the Securities (as defined in Clause 9 of the Loan Agreement).

The Owner covenants and warrants that it has not assigned or pledged and that it will not assign or pledge hereafter to anyone other than the Lender any part or any of the claims and benefits hereby assigned to the Lender.

The Owner is given the permission to collect payments resulting out of the assigned rights/claims (the „Payments") in the ordinary course of business. In order to protect their rights the Lender may revoke or restrict the collection authority.

The Lender is entitled to disclose this Assignment to any third-party debtor and to collect the Payments in case of a) the disclosure being required under the law governing the assigned right, title and/or interest in order to make this Assignment valid and effective and/or b) upon the occurrence of an event of default under the Loan Agreement (and the General Loan Conditions) and/or the Securities (as defined in the Loan Agreement) respectively.

In case the Lender exercises its right to give notice of this Assignment the collection authority of the Owner is automatically cancelled and terminated.

As far as the Lender itself collects Payments, the Lender is authorised to enter into any agreement with a third-party debtor and to take any measures necessary to realise the assigned rights/claims, including but not limited to granting indulgence, deferment or discounts or entering into any compromise.

The Owner undertakes to provide the Lender upon their first demand with all information, evidence, documents and deeds necessary to verify, examine, valuate and realise the assigned rights/claims. In case of termination of the collection authority the Lender is entitled to demand the delivery of all documents relating to the assigned rights/claims.

This Assignment shall be governed by and construed in all respects in accordance with the laws of the Federal Republic of Germany. Place of jurisdiction is Bremen/Federal Republic of Germany, however, the Lender reserves the right to choose as place of jurisdiction any place where the Vessel (as defined in the Loan Agreement) is situated or the Owner's place or any place of the Owner's branch office.

dated.................................

Gorgonia di Navigazione S.p.A.

Enclosure 6

## AMENDMENT TO GENERAL ASSIGNMENT OF EARNINGS

### WHEREAS:

We, D'Amato di Navigazione S.p.A., Naples/Italy (hereinafter called the "Owner"), being the duly registered owners of the "RITA D'AMATO" (hereinafter called the "Vessel") by a First General Assignment of Earnings dated 2 October 2003 have assigned irrevocably and absolutely to

Deutsche Schiffsbank AG, Bremen/Germany,

(hereinafter called the "Bank")

all rights, title and interest in and to:

(a)    all freights hire moneys requisition for hire compensation demurrage detention moneys and all and every other earnings now being earned or due or accruing or at any time during the existence of this security to be earned or become due or in the course of being earned or accruing to or by the Vessel under any charter or contract of employment entered into with regard to the Vessel or otherwise howsoever or as a result of any requisition for use of the Vessel and

(b)    all claims for damages arising out of breach of any rights to terminate any charter or contract of employment (hereinafter the "General Assignment").

The General Assignment in favour of the Bank serves as collateral security for the due repayment of a loan, granted by the Bank in accordance with the terms and conditions of a loan agreement dated 2 October 2003 as amended from time to time between the Owner and the Bank (the "Existing Loan Agreement") and the payment of all other moneys (including but not limited to interest and costs) being due or to become due and payable under the Loan Agreement and the Securities (as defined in Clause 9 of the Existing Loan Agreement).

### NOW THERE THE OWNER DECLARES AS FOLLOWS:

The General Assignment shall in addition thereto serve as collateral security for (i) a Performance Guarantee issued by the Bank as well as for (ii) the due repayment of a loan, granted by the Bank both in accordance with the terms and conditions of a loan agreement dated .......September 2006 as amended from time to time between Gorgonia di Navigazione S.p.A. and the Bank (the "Loan Agreement") and for the payment of all other moneys (including but not limited to interest and costs) being due or to become due and payable under the Loan Agreement and the Securities (as defined in Clause 9 of the Loan Agreement).

The Owner covenants and warrants that it has not assigned or pledged and that it will not assign or pledge hereafter to anyone other than the Bank any part or any of the claims and benefits hereby assigned to the Bank.

This Amendment shall be governed by and construed in all respects in accordance with the laws of the Federal Republic of Germany. Place of jurisdiction is Bremen/Federal Republic of

Germany, however, the Bank reserves the right to choose as place of jurisdiction any place where the Newbuilding (as defined in the Loan Agrement) or the Vessel is situated or the Owner's place or any place of the Owner's branch office.


dated                                    2006


                                              D'Amato di Navigazione S.p.A.

**Enclosure 7**

## FIRST ASSIGNMENT OF INSURANCES

We, Gorgonia di Navigazione S.p.A., Naples/Italy (hereinafter called the "Owner"), being the buyer and becoming the duly registered Owners of the "..........................." (hereinafter called "the Vessel") hereby assign irrevocably and absolutely to

Deutsche Schiffsbank AG, Bremen

(hereinafter called the "Lender")

as creditor of and mortgagee on the Vessel all benefits including all claims of whatsoever nature out of all and every policies and contracts of insurances at present entered in or to be entered into in the future in respect or in connection with the Vessel.

This Assignment in favour of the Lender serves as collateral security for the due repayment of the Loan, granted by the Lender in accordance with the terms and conditions of the Loan Agreement dated...... September 2006 between the Owner and the Lender (the "Loan Agreement") and the payment of all other moneys (including but not limited to interest and costs) being due or to become due and payable under the Loan Agreement and the Securities (as defined in Clause 9 of the Loan Agreement).

There are to be secured the claims of the Lender from time to time outstanding together with interest thereon, costs and other monies due in accordance with the terms of the said Loan Agreement and Securities and / or in connection therewith.

The Owner hereby covenants and warrants that it has not assigned or pledged and that it will not assign or pledge hereafter to anyone other than the Lender in its capacity as Mortgagee any part of any of the claims and benefits hereby assigned to the Lender.

This Assignment shall be governed by and construed in all respects in accordance with the laws of the Federal Republic of Germany. Place of jurisdiction is Bremen/Federal Republic of Germany, however, the Lender reserves the right to choose as place of jurisdiction any place where the Vessel (as defined in the Loan Agrement) is situated or the Owner's place or any place of the Owner's branch office.

dated................................

Gorgonia di Navigazione S.p.A.

## AMENDMENT TO FIRST ASSIGNMENT OF INSURANCES

### WHEREAS:

We, D'Amato di Navigazione S.p.A. Naples/Italy (hereinafter called the "Owner"), being the duly registered Owner of the "RITA D'AMATO" (hereinafter called "the Vessel") have assigned by a First Assignment of Insurances dated 2 October 2003 as amended (hereinafter the "Assignment") irrevocably and absolutely to

Deutsche Schiffsbank AG, Bremen

(hereinafter called the "Bank")

as creditor of and mortgagee on the Vessel all benefits including all claims of whatsoever nature out of all and every policies and contracts of insurances at present entered in or to be entered into in the future in respect or in connection with the Vessel.

The Assignment in favour of the Bank serves as collateral security for the due repayment of a loan granted by the Bank in accordance with the terms and conditions of a loan agreement dated 2 October 2003 as amended from time to time between the Owner and the Bank (the "Existing Loan Agreement") and the payment of all other moneys (including but not limited to interest and costs) being due or to become due and payable under the Existing Loan Agreement and the Securities (as defined in Clause 9 of the Existing Loan Agreement).

### NOW THERE THE OWNER DECLARES AS FOLLOWS:

The Assignment shall in addition thereto serve as collateral security (i) for the due repayment of a loan, granted by the Bank and (ii) for a Performance Guarantee issued by the Bank both in accordance with the terms and conditions of a loan agreement dated ... September 2006 as amended from time to time between Gorgonia di Navigazione S.p.A. and the Bank (the "Loan Agreement") and the payment of all other moneys (including but not limited to interest and costs) being due or to become due and payable under the Loan Agreement and the Securities (as defined in Clause 9 of the Loan Agreement).

There are to be secured the claims of the Bank from time to time outstanding together with interest thereon, costs and other monies due in accordance with the terms of the said Loan Agreement and Securities and / or in connection therewith.

The Owner hereby covenants and warrants that it has not assigned or pledged and that it will not assign or pledge hereafter to anyone other than the any part of any of the claims and benefits hereby assigned to the Bank.

This Amendment shall be governed by and construed in all respects in accordance with the laws of the Federal Republic of Germany. Place of jurisdiction is Bremen/Federal Republic of Germany, however, the Bank reserves the right to choose as place of jurisdiction any

place where the Newbuilding (as defined in the Loan Agrement) or the Vessel is situated or the Owner's place or any place of the Owner's branch office.


dated   ...................... 2006


D'Amato di Navigazione S.p.A.

**Enclosure 9**

## NOTICE OF ASSIGNMENT

(For attachment by way of endorsement to
all policies contracts and cover notes)

We, Gorgonia di Navigazione S.p.A., Naples/Italy, being the Owners of MV "...................."
HEREBY GIVE NOTICE that by an assignment in writing which is dated ........................ we
assigned to

Deutsche Schiffsbank AG, Bremen/Germany

all insurances effected or to be effected in respect of the above vessel including the insurances
constituted by the Policy whereon this Notice is endorsed including all moneys payable and to
become payable thereunder or in connection therewith (including return of premiums).

dated.................................

Gorgonia di Navigazione S.p.A.

**Enclosure 10**

**Wording for the Newbuilding:**

### LOSS PAYABLE CLAUSE

"................................"

The Insurers have taken note that claims arising from the present insurance have been legally assigned on................................ to

Deutsche Schiffsbank AG, Bremen/Germany

- "the Lender" -

The Assignment relates to all and any happenings of events giving rise to a claim in the amount due to the Lender from time to time for payment of capital, interest and incidental costs.

In this connection it is noted and agreed as follows:

1. Claims hereunder payable in respect of a total or constructive total loss or an arranged or agreed or compromised total loss shall be payable to the Lender up to its mortgage interest. Subject thereto all other claims unless and until the Underwriters have received notice from the Lender of a default under the Mortgage on the vessel in favour of the Lender dated............................. in which event all claims under this Policy of insurance shall be payable direct to the Lender up to its mortgage interest shall be payable as follows:

   a) A claim not exceeding USD 1,000,000.- or equivalent in any other currency shall be released directly for the repair salvage or other charges involved or to the Shipowners as reimbursements if they have fully repaid the damage and paid all of the salvage or other charges.

   b) A claim exceeding USD 1,000,000.- or equivalent in any other currency shall be subject to the prior written consent of the Lender be paid to the Shipowners as and when the said vessel is restored to her former state and condition and the liability in respect of which the insurance loss is payable is discharged provided that the insurers may with such consent as aforesaid make payment on account of repair in course of being effected.

2. Notice of termination, rescission or any other fact involving a premature termination of the insurance relation, as well as an amendment of the contract, by which the liability of the insurers is reduced, shall be deemed not to have effect on the above named Lender before the expiration of two weeks from the date on which the Lender have received notice from the insurers of the termination or amendment of the insurance contract. The same applies in the event of a rescission of the insurance contract prior to the happening of the risk. The sale of the ship shall be deemed a fact causing the premature termination of the insurance relation.

3. Should the insurers become released from their liability or the performance against the insured party because of a premium not having been paid due time, the insurers' liability against the Lender shall remain in force notwithstanding until two weeks after the date on which the Lender is in receipt of a already occurred or imminent release from the liability or performance on the part of the insurers, or of the premature termination of the insurance relation.

**Wording for the Collateral Vessel:**

**LOSS PAYABLE CLAUSE**
**Second Mortgage**

**"RITA D'AMATO"**

The Insurers have taken note that claims arising from the present insurance have been legally assigned by an assignment dated 2 October 2003 as amended by amendment dated.... September 2006 to

Deutsche Schiffsbank AG, Bremen/Germany,

- "the Lender" -

The Assignment relates to all and any happenings of events giving rise to a claim in the amount due to the Lender from time to time for payment of capital, interest and incidental costs and is hereby expressly extended also to claims under the Second Mortgage on the vessel dated ............................... in favour of the Lender. 

In this connection it is noted and agreed as follows:

1.  Claims hereunder payable in respect of a total or constructive total loss or an arranged or agreed or compromised total loss shall be payable to the Lender up to its mortgage interest. Subject thereto all other claims unless and until the Underwriters have received notice from the Lender of a default under the above Second Mortgage on the vessel in favour of the Lender in which event all claims under this Policy of insurance shall be payable direct to the Lender up to its mortgage interest shall be payable as follows:

    a)  A claim not exceeding USD 1,000,000 or equivalent in any other currency shall be released directly for the repair salvage or other charges involved or to the Shipowners as reimbursements if they have fully repaid the damage and paid all of the salvage or other charges.

    b)  A claim exceeding USD 1,000,000 or equivalent in any other currency shall be subject to the prior written consent of the Lender be paid to the Shipowners as and when the said vessel is restored to her former state and condition and the liability in respect of which the insurance loss is payable is discharged provided that the insurers may with such consent as aforesaid make payment on account of repair in course of being effected. 

2.  Notice of termination, rescission or any other fact involving a premature termination of the insurance relation, as well as an amendment of the contract, by which the liability of the insurers is reduced, shall be deemed not to have effect on the above named Lender before the expiration of two weeks from the date on which the Lender have received notice from the insurers of the termination or amendment of the insurance contract. The same applies in the event of a rescission of the insurance contract prior to the happening of the risk. The sale of the ship shall be deemed a fact causing the premature termination of the insurance relation.

3.  Should the insurers become released from their liability or the performance against the insured party because of a premium not having been paid due time, the insurers' liability against the Lender shall remain in force notwithstanding until two weeks after the date on which the Lender is in receipt of a already occurred or imminent release from the liability or performance on the part of the insurers, or of the premature termination of the insurance relation.

**Enclosure 11**

## DATED ...... October 2006

**D'AMATO DI NAVIGAZIONE S.p.A.**

**- to -**

**DEUTSCHE SCHIFFSBANK AKTIENGESELLSCHAFT**

---

**DEED OF ASSIGNMENT
OF SHIPBUILDING CONTRACT
AND REFUND GUARANTEE**

---

# CONTENTS

**Page**

1    Definitions and Interpretation .................................................................... 1

2    Assignment ................................................................................................ 3

3    Covenants.................................................................................................... 3

4    Default ........................................................................................................ 5

5    Power of Attorney....................................................................................... 5

6    Further Assurance ...................................................................................... 6

7    Notices ........................................................................................................ 7

8    Law And Jurisdiction .................................................................................. 6

9    Miscellaneous............................................................................................. 7

Appendix A .......................................................................................................... 9

Appendix B .......................................................................................................... 12

Appendix C .......................................................................................................... 15

**DEED OF ASSIGNMENT**

**Dated:**        **.... October 2006**

**BY:**

(1)     **D'Amato di Navigazione S.p.A.,** a company incorporated according to the law of Italy whose registered office is at Via Giovanni Porzio, 4, Centro Direczionale, Isola G/2, I-80143 Naples/Italy (the **"Buyer"**)

**IN FAVOUR OF:**

(2)     **DEUTSCHE SCHIFFSBANK AKTIENGESELLSCHAFT,** acting through its office at Domshof 17, D-28195 Bremen, Federal Republic of Germany (the **"Bank"**).

**WHEREAS:-**

(A)     Pursuant to a Loan Agreement (the **"Loan Agreement"**) dated 29 September 2006 made between (1) **Gorgonia di Navigazione S.p.A.,** a company incorporated according to the law of Italy whose registered office is at Via Giovanni Porzio, 4, Centro Direczionale, Isola G/2, I-80143 Naples/Italy (the **"Debtor"**) and (2) the Bank, the Bank has agreed to (i) advance to the Debtor its respective commitment of an amount of up to thirty million one hundred seventy five thousand US-Dollars (USD 30,175,000) (the **"Loan"**) for the purpose of part financing the Contract Price under the Newbuilding Contract to which the Debtor shall be nominated by the Buyer as buyer and (ii) to issue a Performance Guarantee in favour of the Seller.

(B)     The Buyer in order to secure the fulfillment of all obligations of the Debtor under and pursuant to the Loan Agreement has issued a corporate guarantee in favour of the Bank on .... ................ 2006 (the "Corporate Guarantee").

(C)     Pursuant to the Corporate Guarantee, and as a condition precedent to the obligation of the Bank to make the Loan available to the Debtor and to issue the Performance Guarantee, the Buyer has, amongst other things, agreed to assign the Assigned Rights to the Bank.

**THIS DEED WITNESSES** as follows:-

1        **Definitions and Interpretation**

        1.1     In this Deed:-

                1.1.1   **"Address for Service"** means Via Giovanni Porzio, 4, Centro Direzionale, Isola G/2, I-80143 Naples/Italy

                1.1.2   **"the Assigned Rights"** means all the Buyer's right, title and interest in and to, and all benefits accruing to the Buyer under or pursuant to, the Newbuilding Contract and the Refund Guarantee, including (without limitation) all the Buyer's rights in and to the Vessel as she is constructed, the right to take delivery of the Vessel, all sums payable or which may

1

become payable to or to the order of the Buyer under or pursuant to the Newbuilding Contract or the Refund Guarantee and all damages and other payments (whether awarded by any court or arbitral tribunal or by agreement or otherwise) for breach, termination or variation of the Newbuilding Contract or the Refund Guarantee.

1.1.3   **"the Seller"** means collectively China Shipbuilding Trading Company Ltd., having its registered office at 56, (Yi) Zhongguancun Nandaje, Beijing 100044, the people's Republic of China and Hudong-Zhonghua Shipbuilding (Group) Co. Ltd., having its registered office at 2851 Pudong Da Dao, Shanghai 200129, being companies organised and existing under the laws of the People's Republic of China.

1.1.4   **"the Newbuilding Contract"** means the contract dated 28 March 2006 (as amended) for the design, construction and delivery of one 75,000 DWT bulkcarrier newbuilding having the Seller's hull number H1516A made between the Buyer and the Seller.

1.1.5   **"Contract Price"** means the total purchase price payable for the Vessel under the Newbuilding Contract, such sum not to exceed thirty-five million five hundred thousand Dollars (USD 35,500,000).

1.1.6   **"Default Rate"** means two per cent (2%) per annum above LIBOR.

1.1.7   **"Event of Default"** means any breach by the Buyer of its obligations under the Corporate Guarantee or by the Debtor of its obligations under (i) clause IV. of the General Loan Conditions appended to the Loan Agreement as Enclosure 15 or (ii) clause 15.5 of the Loan Agreement.

1.1.8   **"Encumbrance"** means any mortgage, charge (fixed or floating) pledge, lien, assignment, hypothecation, preferential right, option, title retention or trust arrangement or any other agreement or arrangement which has the effect of creating security or payment priority.

1.1.9   **"Proceedings"** means any suite, action or proceedings begun by the Bank arising out of or in connection with this Deed.

1.1.10  **"Receiving Bank"** means...

1.1.11  **"the Refund Guarantee"** means the irrevocable letter of guarantee numbered ......................................... issued by tested SWIFT message by the Refund Guarantor to the Receiving Bank in favour of the Buyer on ...... October 2006.

1.1.12  **"the Refund Guarantor"** means The Bank of China acting through its Head Office, Banking Department, Beijing , the People's Republic of China.

1.1.13  **"the Vessel"** means the vessel which is the subject of the Newbuilding Contract.

1.2   All words and expressions defined in the Loan Agreement shall have the same meaning when used in this Deed unless otherwise specified or the context otherwise requires.

2

## 2   Assignment

2.1   The Buyer with full title guarantee assigns absolutely and agrees to assign the Assigned Rights (to the fullest extent permissible) to the Bank.

2.2   The Buyer warrants that it has not disposed of, nor created or permitted any Encumbrance or other third party right to arise on or over, any of the Assigned Rights or the Vessel.

2.3   The Buyer undertakes:-

2.3.1   to do or permit to be done everything which the Bank may from time to time reasonably require to be done for the purpose of enforcing the Bank's rights under this Deed, and to allow its name to be used as and when required by the Bank for that purpose; and

2.3.2   immediately following the execution of this Deed to give written notice (materially in the forms set out in Appendices A and B or in such other forms as the Bank may require) to the Seller and the Refund Guarantor of the assignment of the Assigned Rights contained in this Deed, and to procure the prompt acknowledgement of those notices by the Seller and the Refund Guarantor in such manner as the Bank may require; and

2.3.3   to reimburse the Bank on demand for all sums which the Bank may from time to time pay or become liable for in or about the protection, maintenance or enforcement of the rights created in favour of the Bank by this Deed or in or about the exercise by the Bank of any of the powers vested in it under or pursuant to this Deed, together in each case with interest at the Default Rate from the date when those sums were paid by the Bank until the date of actual receipt, before or after any relevant judgement, and to keep the Bank fully and effectually indemnified from and against all actions, losses, claims, proceedings, costs, demands and liabilities which the Bank may suffer or incur under or in connection with the Newbuilding Contract, the Vessel or the Refund Guarantee.

2.4   The Bank agrees that, unless and until an Event of Default shall have occurred, the Buyer shall be entitled to exercise all of its rights under the Newbuilding Contract, except as otherwise expressly provided in, or inconsistent with, this Deed.

2.5   The Buyer acknowledges that the Bank shall be under no obligation to perform any obligation under or pursuant to the Newbuilding Contract unless it sees fit to do so; in the event that the Bank does perform any obligation under or pursuant to the Newbuilding Contract and makes any payment in respect of or in relation to the Newbuilding Contract, the amount of any payment made by the Bank shall (without prejudice to the generality of Clause 2.3.3) be repaid by the Buyer to the Bank on demand, together with interest at the Default Rate from the date when the payment in question was made by the Bank until the date of actual receipt, before or after any relevant judgement.

## 3   Covenants

The Buyer undertakes:-

3.1     duly and punctually to observe and perform all the obligations imposed on it by or pursuant to the Newbuilding Contract;

3.2     to take all steps within its power to ensure that the Seller observes and performs all obligations imposed on the Seller by or pursuant to the Newbuilding Contract and proceeds with the construction of the Vessel in accordance with the Newbuilding Contract;

3.3     on the request of the Bank from time to time to give all information which the Bank may require with regard to the construction of the Vessel and the performance by the Seller of its obligations under the Newbuilding Contract;

3.4     to notify the Bank immediately in the event that the Seller exercises, or purports to exercise or gives notice (written or oral) of its intention to exercise, any right to terminate or cancel the Newbuilding Contract or to render a performance materially different from that which the Newbuilding Contract obliges it to render;

3.5     not without the prior written consent of the Bank (and then only on such terms and conditions as the Bank shall impose):-

        3.5.1   to make or agree to make any material alteration in or amendment or supplement to the Newbuilding Contract or the Refund Guarantee nor to waive performance by the Seller or the Refund Guarantor of any of its obligations under or pursuant to the Newbuilding Contract or the Refund Guarantee; nor

        3.5.2   to dispose of, nor create nor permit to arise or continue any Encumbrance or other third party right on or over, any of the Assigned Rights or the Vessel, other than in favour of the Bank; nor

        3.5.3   to exercise any right or purported right which the Buyer may have to terminate the Newbuilding Contract; nor

        3.5.4   to make any demand for payment under the Refund Guarantee; nor

        3.5.5   to let or agree to let the Vessel on charter for any period which (inclusive of any extension option) is capable of exceeding thirteen (13) months;

3.6     to deliver to the Bank a duly certified true copy of the Refund Guarantee;

3.7     to obtain on the date of this Deed a written confirmation from the Receiving Bank addressed to the Bank, whereby the Receiving Bank confirms that it holds the original Refund Guarantee to the order of the Bank;

3.8     on the date of this Deed to execute and deliver to the Bank a duly executed, notarised and apostilled irrevocable power of attorney in the form set out in Appendix C; and

3.9     upon the Bank's first demand make a demand for (i) payment under the Refund Guarantee or (ii) any other monies due to the Buyer under or pursuant to the Newbuilding Contract and for the Refund Guarantee.

4

**4        Default**

4.1        At any time following the occurrence and during the continuation of an Event of Default the Bank may (but shall not be obliged to) exercise any of the following rights and powers:-

   4.1.1        to implement the Newbuilding Contract or to agree with the Builder to terminate the Newbuilding Contract, in either case on such terms and subject to such conditions as the Bank and the Seller may agree;

   4.1.2        to sell the Vessel in her then state of construction or after delivery of the Vessel pursuant to the Newbuilding Contract, in either case on such terms and subject to such conditions as the Bank and the Seller may agree;

   4.1.3        to undertake the further supervision of construction of the Vessel;

   4.1.4        to collect, recover or compromise, and give a good discharge for, any amounts payable by the Seller to the Buyer or any damages recoverable by the Buyer from the Seller or any rebate in the price payable under or in connection with the Newbuilding Contract;

   4.1.5        to demand payment and collect, recover or compromise, and give a good discharge for, any amounts payable by the Refund Guarantor to the Buyer or any damages recoverable by the Buyer from the Refund Guarantor under or in connection with the Refund Guarantee.

4.2        The Bank shall be entitled to exercise its powers under this Clause in such manner, in such order, and at such times as the Bank in its absolute discretion may determine and the Bank shall not in any circumstances be liable for any loss occasioned by its exercise, or delay or failure in exercising, any such power.

4.3        On any sale of the Vessel by the Bank the purchaser shall not be bound to enquire whether the Bank's power of sale has arisen and the sale shall be deemed to be within the power of the Bank; the receipt of the Bank for the purchase money shall be an effective discharge to the purchaser who shall not be concerned with the manner of its application.

**5        Power of Attorney**

The Buyer by way of security irrevocably appoints the Bank its attorney (with unlimited power of substitution and delegation) with power (in its name or otherwise) following the occurrence of any Event of Default to take all steps that the Bank shall in its discretion consider appropriate to enforce its rights under or pursuant to this Deed, including (without limitation) to make a demand for payment under the Refund Guarantee, to give a good receipt for any money forming part of the Assigned Rights and to institute any proceedings in connection with the Assigned Rights, and otherwise to do all things which the Buyer itself could do in relation to the Assigned Rights,   neither the Bank nor any substitute or delegate of the Bank being liable or answerable for any involuntary losses which may happen or arise in or about the exercise of the rights, powers and discretions vested in the Bank under or pursuant to this Deed.

**6      Further Assurance**

If any provision of this Deed shall be invalid, or unenforceable in whole or in part, by reason of any present or future law or any decision of any court or if the documents held by the Bank is considered by it (such consideration to be reasonable) to be insufficient to carry out the terms of the Deed, the Buyer agrees that from time to time on the written request of the Bank it will immediately execute and deliver to the Bank all further instruments and documents which the Bank may reasonably require for the purpose of obtaining the full benefits of this Deed.

**7      Notices**

Any and all declarations and notices pursuant to and in connection with this Deed shall be sent (i) in case of the Bank to its address at the head of this Agreement (fax-no. +49 421 32 35 39) and (ii) in case of the Buyer to its address at the head of this Agreement (fax-no. 0039 081 551 1420).

**8      Law And Jurisdiction**

8.1     This Deed shall in all respects be governed by and interpreted in accordance with English law.

8.2     For the exclusive benefit of the Bank, the Buyer irrevocably agrees that the courts of England are to have jurisdiction to settle any disputes which may arise out of or in connection with this Deed and that any Proceedings may be brought in those courts.

8.3     Nothing contained in this Clause shall limit the right of the Bank to commence any Proceedings against the Buyer in any other court of competent jurisdiction nor shall the commencement of any Proceedings against the Buyer in one or more jurisdictions preclude the commencement of any Proceedings in any other jurisdiction, whether concurrently or not.

8.4     The Buyer irrevocably waives any objection which it may now or in the future have to the laying of the venue of any Proceedings in any court referred to in this Clause, and any claim that those Proceedings have been brought in an inconvenient or inappropriate forum, and irrevocably agrees that a judgment in any Proceedings commenced in any such court shall be conclusive and binding on it and may be enforced in the courts of any other jurisdiction.

8.5     Without prejudice to the right of the Bank to use any other method of service permitted by law, the Buyer irrevocably agrees that any writ, notice, judgment or other legal process shall be sufficiently served on it if addressed to it and left at or sent by post to the Address for Service, and in that event shall be conclusively deemed to have been served at the time of leaving or, if posted, at 9.00 a.m. on the Business Day after posting by prepaid first class post.

9 **Miscellaneous**

9.1 If at any time any provision of this Deed becomes invalid, illegal or unenforceable in any respect that provision shall be severed from the remainder and the validity, legality and enforceability of the remaining provisions of this Deed shall not be affected or impaired in any way.

9.2 In the event of there being any conflict between this Deed the Corporate Guarantee and/or the Loan Agreement, the Loan Agreement shall prevail.

9.3 This Deed may be executed in any number of counterparts each of which shall be original but which shall together constitute the same instrument.

9.4 Notwithstanding the assignments contained in this Deed, the Bank shall not be obliged to make any enquiry as to the nature or sufficiency of any payment received by it under or in connection with this Deed nor to make any claim or take any other action to collect any money or to enforce any rights and benefits assigned to the Bank by this Deed or to which the Bank may at any time be entitled under or pursuant to this Deed.

9.5 The Buyer shall remain liable to perform all the obligations assumed by it in relation to the Newbuilding Contract and the Refund Guarantee and the Bank shall be under no obligation of any kind in respect thereof nor under any liability in the event of any failure by the Buyer to perform, or breach by the Buyer of, any of those obligations.

9.6 The rights conferred on the Bank by this Deed shall be continuing, notwithstanding any intermediate repayment or settlement of account or any other matter or thing, and shall be without prejudice and in addition to any security now or in the future held by the Bank for or in respect of the Loan and shall not merge with or prejudice or be prejudiced by any such security or any other contractual or legal rights of the Bank nor be affected by any irregularity, defect or informality or by any release, exchange or variation of any such security.

9.7 The Bank may give time for payment to, release or make other arrangements with the Buyer the Debtor and/or any other person who gives security for all or any part of the Loan without prejudicing the rights of the Bank under this Deed, which rights shall not be affected by any defective, excessive or irregular exercise of any of the powers of the Buyer the Debtor and/or any other person who gives security for all or any part of the Loan. 

9.8 The Bank's rights under this Deed shall not be affected by any change in the constitution of the Buyer or by the liquidation, bankruptcy or insolvency of the Buyer.

9.9 All the covenants and agreements of the Buyer in this Deed shall bind the Buyer and its successors and permitted assignees and shall inure to the benefit of the Bank and its successors, transferees and assignees.

9.10 No variation or amendment of this Deed shall be valid unless in writing and signed on behalf of the Buyer and the Bank.

9.11 The headings used in this Deed are for the purpose of reference only; have no legal or other significance, and shall be ignored in the interpretation of this Deed.

9.12    The provisions of this Deed (other than those contained in this Clause 9.12) shall have no effect until this Deed has been dated.

9.13    Notwithstanding the provisions of the Contracts (Rights of Third Parties) Act 1999, no term of this Deed is enforceable by a person who is not a Party to it.

**IN WITNESS**  of which this Deed has been duly executed and delivered the day and year first before written.

| | |
|---|---|
| **SIGNED**  and  **DELIVERED** | ) |
| as a deed by | ) |
| the duly authorised | ) |
| attorney for and on behalf of | ) |
| **D'Amato di Navigazione S.p.A.** | |
| in the presence of:- | ) |

| | |
|---|---|
| **SIGNED** | ) |
| by | ) |
| for and on behalf of | ) |
| **DEUTSCHE SCHIFFSBANK** | ) |
| **AKTIENGESELLSCHAFT** | ) |
| in the presence of:- | ) |

8

**Appendix A**

**Notice of Assignment**

To:     China Shipbuilding Trading Co. Ltd.
        and
        Hudong-Zhonghua Shipbuilding (Group) Co. Ltd.


We, D'Amato di Navigazione S.p.A., Via Giovanni Porzio, 4, Centro Direzionale, Isola G/2, I-80143 Naples/Italy **GIVE NOTICE**  that, by an assignment in writing dated ... October 2006 ("**the Assignment**"), we assigned absolutely to Deutsche Schiffsbank Aktiengesellschaft of Domshof 17, 28195 Bremen, Federal Republic of Germany ("**the Bank**") all our right, title and interest in and to, and all benefits accruing to us under or pursuant to, the contract dated 28 March 2006 made between you and us (as amended, supplemented, novated or replaced from time to time "**the Newbuilding Contract**") for the design, construction and delivery of one 75,000 DWT bulkcarrier newbuilding  having your hull number H1516A ("**the Vessel**") including (without limitation) all our rights in and to the Vessel as she is constructed, our right to take delivery of the Vessel, all sums payable or which may become payable to us or to our order under or pursuant to the Newbuilding Contract and all damages and other payments (whether awarded by any court or arbitral tribunal or by agreement or otherwise) for breach, termination or variation of the Newbuilding Contract (collectively "**the Newbuilding Contract Rights**").

We irrevocably authorise and instruct you:-

(i)      to hold the Vessel (as defined in the Newbuilding Contract) to the order and at the disposal of the Bank;

(ii)     to deliver to or to the order of the Bank the Builder's Certificate and any other document of title to the Vessel;

(iii)    to pay to the Bank all sums which you may become due to pay to us or to our order forming part of the Newbuilding Contract Rights.

Please note that:-

(i)      nothing in this notice nor in the Assignment should be interpreted as imposing any obligation on the Bank to you in respect of or relating to the Newbuilding Contract or the Newbuilding Contract Rights;

(ii)     unless and until you receive written notice from the Bank to the contrary, you should continue to deal with us in relation to the supervision of the construction of the Vessel and the performance of our obligations under or pursuant to the Newbuilding Contract;

(iii)    the Newbuilding Contract may not be altered, amended or supplemented, nor may we waive performance of any of your obligations under or pursuant to the Newbuilding Contract, without in each case the prior written consent of the Bank; and

9

(iv)    we may not exercise any right or purported right which we may have to terminate the Newbuilding Contract without the prior written consent of the Bank.

The authority and instructions contained in this notice may not be varied or revoked without the prior written consent of the Bank.

For and on behalf of
D'Amato di Navigazione S.p.A.

.......................................................

Dated        October 2006

To:     D'Amato di Navigazione S.p.A.
        and
        Deutsche Schiffsbank Aktiengesellschaft


We acknowledge receipt of the notice set out above and, in consideration of the sum of ten United States Dollars (USD10) paid to us by D'Amato di Navigazione S.p.A., the receipt and sufficiency of which we acknowledge, consent to the assignment referred to in that notice and agree to comply in all respects with the instructions contained in that notice.

For the same consideration, we confirm that we have received no notice of any previous assignment of, or other third party right affecting, any of the Newbuilding Contract Rights, and we undertake:-

(i)     to inform the Bank immediately in writing should any default be made by D'Amato di Navigazione S.p.A. in the payment of any sum due to us under or in connection with the Newbuilding Contract or should there occur any default or other event as a result of which we claim to be entitled to terminate or cancel the Newbuilding Contract; and

(ii)    that before exercising any right to terminate or cancel the Newbuilding Contract, we will give to the Bank at least fourteen days' written notice of our intention to do so and the opportunity during that period to rectify any default.


For and on behalf of
China Shipbuilding Trading Co. Ltd.
Hudong-Zhonghua Shipbuilding (Group) Co. Ltd.


...........................................
Dated                   2006


11

**Appendix B**

**Notice of Assignment**

To:    The Bank of China

We, D'Amato di Navigazione S.P.A. of Via Giovanni Porzio, 4, Centro Direzzionale, Isola G/2, I-80143 Naples/Italy, refer to the irrevocable letter of Guarantee with No. ..............................
dated ... October 2006 issued by you to us (the **"Guarantee"**) whereby, subject to the terms therein, you have guaranteed to pay to us the sum of 17,750,000 United States Dollars (USD seventeen million seven hundred and fifty thousand) which China Shipbuilding Trading Co. Ltd. and Hudong-Zhonghua Shipbuilding (Group) Co. Ltd. (hereinafter collectively called the **"Seller"**) may become liable to repay to us under the shipbuilding contract dated 28 March 2006 made between us and the Seller (the **"Shipbuilding Contract"**).  Pursuant to the Shipbuilding Contract the Seller has agreed to construct for us and we have agreed to purchase one (1) unit of 75,000 dwt bulkcarrier newbuilding known as hull No. H1516A subject to and upon the terms and conditions contained in the Shipbuilding Contract.

**NOW WE HEREBY GIVE YOU NOTICE**  that:-

1        By an assignment in writing dated...... October 2006 (the **"Assignment"**) made between us and Deutsche Schiffsbank Aktiengesellschaft of Domshof 17, 28195 Bremen, Federal Republic of Germany (the **"Bank"**) we have assigned absolutely to the Bank all our right, title and interest in and to, and all benefits accruing to us under or pursuant to the Guarantee (with the exception of the right to make a demand for payment which shall remain with us) as and when all money or any part thereof shall become payable by you to us under the Guarantee.

2        We have appointed the Bank as our attorney with full power to receive the proceeds described in any demand made or to be made by us which will be presented by us in accordance with the terms of the Guarantee.

3        We shall make any claims under the Guarantee only in strict accordance with the Shipbuilding Contract.

4        You are irrevocably authorised and instructed by us to pay to the Bank all sums or any part thereof which you may become due to pay to us under the Guarantee.

5        The authority and instructions contained in this notice cannot be varied or revoked without the prior written consent of the Bank.

6        The notice of assignment is governed by the Laws of England.

For and on behalf of
D'Amato di Navigazione S.p.A.

.......................................
Dated                       2006

12

This notice has been countersigned for and on behalf of Deutsche Schiffsbank Aktiengesellschaft by its authorised signatories/attorney-in-fact

......................................
Dated                    2006

To:    D'Amato di Navigazione S.p.A.

and
Deutsche Schiffsbank Aktiengesellschaft

We acknowledge receipt of the notice set out above and agree to comply with it.


For and on behalf of


........................................
Dated                 2006

**Appendix C**

**Power of Attorney**

Know all men by these presents that we D'Amato di Navigazione S.p.A. (hereinafter called "**the Grantor**") a company incorporated under the laws of Italy with its registered office at Via Giovanni Porzio, 4, Centro Direzionale, Isola G/2, I-80143 Naples/Italy hereby constitute and appoint Deutsche Schiffsbank Aktiengesellschaft ("**the Attorney**") acting through its office at Domshof 17, 28195, Bremen, Federal Republic of Germany, our true and lawful attorney, with full power to appoint (under hand or seal) a substitute attorney to agree, accept and sign under hand or seal:-

(i)     any demand for payment under the irrevocable letter of guarantee numbered ......................................... issued by tested SWIFT message by The Bank of China, Beijing (the "**Refund Guarantor**") to .................................................................................. (the "**Receiving Bank**") in favour of the Grantor on ..................... 2006 (the "**Refund Guarantee**"); and

(ii)    any and all other documents required by the Refund Guarantor and/or the Receiving Bank in connection with the making of a demand for payment under the Refund Guarantee.

all such documents to be in such form and to contain such terms and conditions as the Attorney shall deem necessary or desirable.

Further the Attorney is hereby appointed and authorised to receive any and all proceeds paid or payable under the Refund Guarantee and to do all such things and take all such steps and sign and seal or otherwise execute and deliver all such further deeds and documents as the Attorney shall in its absolute discretion deem necessary or desirable in order to complete and perfect the transactions contemplated hereby.

And the Grantor will ratify and confirm all that the Attorney may lawfully do by virtue of these presents.

This Power of Attorney shall be irrevocable and shall at all times be conclusive and binding upon the Grantor and no person or corporation having dealings with the Attorney or its substitutes under this Power of Attorney shall be under any obligation to make any enquiries as to whether or not this Power of Attorney has been revoked and all acts under this Power of Attorney shall be valid and binding on the Grantor.

The Grantor irrevocably and unconditionally undertakes to indemnify the Attorney or its substitutes and their respective estates against all actions, proceedings, claims, costs, expenses and liabilities of every description arising from the exercise, or purported exercise, in good faith of any of the powers conferred by this Power of Attorney.

In witness of which we have caused these presents to be executed this .... day of ..................... 2006.

| | |
|---|---|
| **SIGNED** and **DELIVERED** as a **DEED** | ) |
| by | ) |
| the duly authorised attorney/signatory | ) |
| for and on behalf of | ) |
| D'Amato di Navigazione S.p.A. | ) |
| in the presence of:- | ) |

**Enclosure 12**

_____ 2006

Messrs
Deutsche Schiffsbank AG
Domshof 17
28195 **Bremen**
**(Federal Republic of Germany)**

The undersigned Michele D'Amato, born in Torre del Greco, on 1 November 1938, domiciled at Naples Via Giovanni Porzio No. 4 Centro Direzionale, Isola G/2, fiscal code DMTMHL38S01L259M ("the Guarantor")

## WHEREAS

1) By virtue of a loan agreement, executed in Bremen on _____ 2006, governed by German Law and written in English language (the "Loan Agreement"), **Gorgonia di Navigazione S.p.A.**, a company incorporated according to the laws of Italy whose registered office at Via Giovanni Porzio, 4, Centro Direzionale, Isola G/2, I-80143 Naples/Italy (the "Debtor") entered into a loan facility agreement with Deutsche Schiffsbank Aktiengesellschaft (the "Bank"), for the purpose of obtaining:

   a) a loan in the maximum amount of USD 30,175,000 ("the Loan") and
   b) a guarantee in favour of China Shipbuilding Trading Company Ltd. and Hudong-Zhonghua Shipbuilding (Group) Co. Ltd., China (collectively the "Seller") in the amount of USD 3,550,000 (the "Performance Guarantee"),

   the Loan and the Performance Guarantee will be referred hereinafter together as the "Total Loan".

2) Terms and conditions of the Loan Agreement and of the Enclosures thereto, that are known to the Guarantor, are recalled herein so as to form an integral and substantial part of this deed.

3) The Bank has required that Mr. Michele D'Amato gives an unconditional and irrevocable personal guarantee, in favour of the Bank, for the due fulfilment of the obligations of the Debtor under the Loan Agreement above mentioned.

4) The Guarantor has a personal interest in the acquisition of the Total Loan by the Debtor,

In consideration of the above, the undersigned

## Gives

unconditional and irrevocable, jointly and severally with the Debtor, personal guarantee in favour of the Bank to secure the proper and timely performance of the obligations of the Debtor under the Loan Agreement and the Securities thereof and, particularly, the repayment of the principal, the payment of the relevant interest, including the interest accrued for delayed payment and any other amount due, reimbursement of expenses and however whatsoever

obligation deriving from the Loan Agreement and the Securities thereof, any and all terms and conditions thereof that are well known by the undersigned are deemed integrally recalled herein so as to form an integral and substantial part of this deed.

The Guarantor will be bound to pay any amount due to the Bank at first request of the Bank abstractly and automatically renouncing to raise whatsoever objection in respect of the existence, validity and coerciveness of the secured obligations in respect of which the Guarantor remains totally not connected.

The Guarantor declares that the Bank is exonerated from acting in compliance within the time limits provided for by Art. 1957 of Italian Civil Code and, as a result, the Guarantor will remain obliged also in the event that the Bank will fail to start and/or prosecute an action against the Debtor and/or the other co-obliged parties, if any.

The Guarantor acknowledges that the Bank is entitled to decide which of the Debtor's obligations have been satisfied by the payments made by the Guarantor himself.

The present guarantee is fully valid independently from any other personal or real guarantee, still existing or subsequently to be given in favour of the Bank on behalf of the sameself Debtor.

The maximum amount secured by the present guarantee will be of USD 1,500,000.

The present guarantee shall be governed by and construed in accordance with Italian law and the place of exclusive jurisdiction shall be Naples/Italy.


_____
Michele D'Amato

_2_

**Enclosure 13**

_____ 2006

Messrs
Deutsche Schiffsbank AG
Domshof 17
28195 **Bremen**
**(Federal Republic of Germany)**

The undersigned **D'Amato di Navigazione S.p.A.,** a company incorporated according to the laws of Italy whose registered office is at Via Giovanni Porzio, 4, Centro Direzionale, Isola G/2, I-80143 Naples/Italy, Fiscal Code and number of registration at _Registro delle Imprese_ of Naples no _____ ("the Guarantor"), represented by _____ born in _____ on _____ domiciled for these purposes at the above-mentioned Company, who takes part in this deed by virtue of _____

### WHEREAS

**1)** By virtue of a loan agreement, executed in Bremen on _____ 2006, governed by German Law and written in English language (the "Loan Agreement"), **Gorgonia di Navigazione S.p.A.,** a company incorporated according to the laws of Italy whose registered office at Via Giovanni Porzio, 4, Centro Direzionale, Isola G/2, I-80143 Naples/Italy (the "Debtor") entered into a loan facility agreement with Deutsche Schiffsbank Aktiengesellschaft (the "Bank"), for the purpose of obtaining:

   a) a loan in the maximum amount of USD 30,175,000 ("the Loan") and
   b) a guarantee in favour of China Shipbuilding Trading Company Ltd. and Hudong-Zhonghua Shipbuilding (Group) Co. Ltd., China (collectively the "Seller") in the amount of USD 3,550,000 (the "Performance Guarantee"),
   the Loan and the Performance Guarantee will be referred hereinafter together as the "Total Loan".

**2)** Terms and conditions of the Loan Agreement and of the Enclosures thereto, that are known to the Guarantor, are recalled herein so as to form an integral and substantial part of this deed.

**3)** The Bank has required that D'Amato di Navigazione S.p.A. gives an unconditional and irrevocable personal guarantee, in favour of the Bank, for the due fulfilment of the obligations of the Debtor under the Loan Agreement above mentioned.

**4)** The Guarantor, majority shareholders of Gorgonia di Navigazione S.p.A., has a personal interest in the acquisition of the Total Loan by the Debtor,

In consideration of the above, the undersigned

### Gives

unconditional and irrevocable, jointly and severally with the Debtor, personal guarantee in favour of the Bank to secure the proper and timely performance of the obligations of the Debtor under the Loan Agreement and the Securities thereof and, particularly, the repayment of the principal, the payment of the relevant interest, including the interest accrued for delayed

payment and any other amount due, reimbursement of expenses and however whatsoever obligation deriving from the Loan Agreement and the Securities thereof, any and all terms and conditions thereof that are well known by the undersigned are deemed integrally recalled herein so as to form an integral and substantial part of this deed.

The Guarantor will be bound to pay any amount due to the Bank at first request of the Bank abstractly and automatically renouncing to raise whatsoever objection in respect of the existence, validity and coerciveness of the secured obligations in respect of which the Guarantor remains totally not connected.

The Guarantor declares that the Bank is exonerated from acting in compliance within the time limits provided for by Art. 1957 of Italian Civil Code and, as a result, the Guarantor will remain obliged also in the event that the Bank will fail to start and/or prosecute an action against the Debtor and/or the other co-obliged parties, if any.

The Guarantor acknowledges that the Bank is entitled to decide which of the Debtor's obligations have been satisfied by the payments made by the Guarantor himself.

The present guarantee is fully valid independently from any other personal or real guarantee, still existing or subsequently to be given in favour of the Bank on behalf of the sameself Debtor.

The maximum amount secured by the present guarantee will be of USD _____.

The present guarantee shall be governed by and construed in accordance with Italian law and the place of exclusive jurisdiction shall be Naples/Italy.

_____
................ on behalf of D'Amato di Navigazione S.p.A.

**Enclosure 14**

## FORM OF NOTARIAL ACKNOWLEDGEMENT OF DEBT

Gorgonia di Navigazione S.p.A. (hereinafter the "Debtor") a company incorporated and validly existing under the laws of the Republic of Italy, having its registered office at _____ via _____ no. ___, fully paid stock capital of Eur _____, Fiscal Code and Registration Number at the Registro delle Imprese of _____ no. _____, duly represented by _____ born in _____ on _____, in his capacity of _____, domiciled for the purpose of this act at the above mentioned Company,

Whereas

By virtue of a loan agreement ("the Loan Agreement"), executed in Bremen on ..... September 2006, governed by German Law and written in English Language, the Debtor entered into a loan facility arrangement with Deutsche Schiffsbank Aktiengesellschaft, of Domshof 17, D-28195 Bremen, Federal Republic of Germany, ("the Lender"), for the purpose of obtaining inter alia a loan in an amount not exceeding USD 30,175,000 (thirty million one-hundred and seventy-five thousand US-Dollars) ("the Loan") for part-financing of the contract price of the 75,000 tdw bulkcarrier newbuilding with hull no. H1516A of Hudong Shipyard.

Acknowledges receipt

Of the amount of USD _____ (_____) received by the Lender and, representing that the Company owes this amount to the Lender, does hereby undertake to repay the Loan pursuant to the terms and condition of the Loan Agreement and the Enclosures thereof.

**Enclosure 15a**

> Rahmenvertrag vom
>
> .... September 2006

# RAHMENVERTRAG für Finanztermingeschäfte

zwischen

**Gorgonia di Navigazione S.p.A.**
Via Giovanni Porzio 4, Centro Direzionale, Isola G/2
80143 Neapel
Italien

(nachstehend der "Vertragspartner" genannt)

und

**Deutsche Schiffsbank Aktiengesellschaft** Bremen und Hamburg
Domshof 17
D-28195 Bremen
Bundesrepublik Deutschland

(nachstehend die "Bank" genannt)

wird folgendes vereinbart:

## 1. Zweck und Gegenstand des Vertrages

(1) Die Parteien beabsichtigen, zur Gestaltung von Zinsänderungs-, Währungskurs- und sonstigen Kursrisiken im Rahmen ihrer Geschäftstätigkeit Finanztermingeschäfte abzuschließen, die

a) den Austausch von Geldbeträgen in verschiedenen Währungen oder von Geldbeträgen, die auf der Grundlage von variablen oder festen Zinssätzen, Kursen, Preisen oder sonstigen Wertmessern, einschließlich diesbezüglicher Durchschnittswerte (Indices), ermittelt werden, oder

b) die Lieferung oder Übertragung von Wertpapieren, anderen Finanzinstrumenten oder Edelmetallen oder ähnliche Leistungen

zum Gegenstand haben. Zu den Finanztermingeschäften gehören auch Options-, Zinsbegrenzungs- und ähnliche Geschäfte, die vorsehen, daß eine Partei ihre Leistung im voraus erbringt oder daß Leistungen von einer Bedingung abhängig sind.

(2) Für jedes Geschäft, das unter Zugrundelegung dieses Rahmenvertrages abgeschlossen wird (nachstehend "Einzelabschluß" genannt), gelten die nachfolgenden Bestimmungen. Alle Einzelabschlüsse bilden untereinander und zusammen mit diesem Rahmenvertrag einen einheitlichen Vertrag (nachstehend der "Vertrag" genannt); sie werden im Sinne einer einheitlichen Risikobetrachtung auf dieser Grundlage und im Vertrauen darauf getätigt.

## 2. Einzelabschlüsse

(1) Haben sich die Parteien über einen Einzelabschluß geeinigt, so wird die Bank dem Vertragspartner schriftlich, fernschriftlich, telegraphisch, durch Telefax oder in ähnlicher Weise dessen Inhalt bestätigen.

(2) Jede Partei ist berechtigt, eine unterzeichnete Ausfertigung des Einzelabschlusses zu verlangen, die jedoch keine Voraussetzung für dessen Rechtswirksamkeit ist.

(3) Die Bestimmungen des Einzelabschlusses gehen den Bestimmungen dieses Rahmenvertrages vor.

## 3. Zahlungen und sonstige Leistungen

(1) Jede Partei wird die von ihr geschuldeten Zahlungen und sonstigen Leistungen spätestens an den im Einzelabschluß genannten Fälligkeitstagen an die andere Partei erbringen.

(2) Sämtliche Zahlungen sind in der aufgrund des Einzelabschlusses geschuldeten Vertragswährung kostenfrei und in der für Zahlungen in dieser Währung handelsüblichen Weise auf das im Einzelabschluß genannte Konto des Zahlungsempfängers in am Fälligkeitstag frei verfügbaren Mitteln zu leisten.

(3) Haben beide Parteien an demselben Tag aufgrund des Vertrages Zahlungen in der gleichen Währung zu leisten, zahlt die Partei, die den höheren Betrag schuldet, die Differenz zwischen den geschuldeten Beträgen. Die Bank wird dem Vertragspartner den zu zahlenden Differenzbetrag rechtzeitig vor dessen Fälligkeit mitteilen.

(4) Zahlt eine Partei nicht rechtzeitig, so werden bis zum Zeitpunkt des Eingangs der Zahlung des fälligen Betrages Zinsen hierauf zu dem Satz berechnet, der um den in Nr. 12 Abs. 3 festgelegten Zinszuschlag über dem Zinssatz liegt, den erstklassige Banken für jeden Tag, für den diese Zinsen zu berechnen sind, untereinander für täglich fällige Einlagen am Zahlungsort in der Währung des fälligen Betrages berechnen. Die Geltendmachung eines weiteren Schadens ist nicht ausgeschlossen.

(5) Ist ein Fälligkeitstag kein Bankarbeitstag, so sind die Zahlungen und sonstigen Leistungen nach Maßgabe des Einzelabschlusses wie folgt zu erbringen:
a) am unmittelbar vorhergehenden Bankarbeitstag, oder
b) am unmittelbar folgenden Bankarbeitstag, oder
c) am unmittelbar folgenden Bankarbeitstag; sofern dieser jedoch in den nächsten Kalendermonat fällt, am unmittelbar vorhergehenden Bankarbeitstag.

## 4. Bankarbeitstag

"Bankarbeitstag" im Sinne dieses Vertrags ist jeder Tag, an dem die Banken an den im Einzelabschluß genannten Finanzplatz/Finanzplätzen für Geschäfte, einschließlich des Handels in Fremdwährungen und der Entgegennahme von Fremdwährungseinlagen, geöffnet sind (mit Ausnahme des Samstags und des Sonntags).

## 5. Bezugsgröße

(1) Ist in einem Einzelabschluß ein variabler Zinssatz, Kurs, Preis oder sonstiger Wertmesser ("variable Größe") vereinbart, so wird die Bank dem Vertragspartner an dem Tag, an dem diese variable Größe zu bestimmen ist ("Feststellungstag") oder unverzüglich danach die zugrundeliegende Bezugsgröße mitteilen.

Sollte die im jeweiligen Einzelabschluß vereinbarte Bezugsgröße an einem Feststellungstag nicht ermittelt werden können, werden die Parteien diese unter Rückgriff auf Berechnungsgrundlagen festlegen, die den im Einzelabschluß vereinbarten möglichst nahekommen. Falls die Bezugsgröße ein Interbankenzinssatz ist und innerhalb von 20 Tagen nicht einvernehmlich festgelegt worden ist, gilt als Bezugsgröße das arithmetische Mittel der Zinssätze, zu denen zwei von der Bank zu benennende, international angesehene Banken am Interbankenmarkt erstklassigen Banken Termingelder mit entsprechender Laufzeit der Vertragswährung in ungefährer Höhe des Bezugsbetrages gegen 11:00 Uhr (Ortszeit am betreffenden Interbankenmarkt) am Feststellungstag angeboten haben.

Ein als Bezugsgröße dienender Zinssatz ("Basis-Satz") ist gegebenenfalls auf den nächsten $^1/_{100.000}$ Prozentpunkt aufzurunden.

**Berechnungsweise bei zinssatzbezogenen Geschäften**

Der aufgrund eines Einzelabschlusses jeweils zu zahlende variable Betrag ist das Produkt aus (a) dem dafür vereinbarten Bezugsbetrag, (b) dem nach Nr. 5 und dem Einzelabschluß errechneten variablen Zinssatz ("variabler Satz"), als Dezimalzahl ausgedrückt, sowie (c) dem Quotienten im Sinne des Abs. 5.

Der aufgrund eines Einzelabschlusses jeweils zu zahlende Festbetrag ist, falls er im Einzelabschluß betragsmäßig festgelegt wird, der dort genannte Betrag. Anderenfalls ist er das Produkt aus (a) dem dafür vereinbarten Bezugsbetrag, (b) dem im Einzelabschluß vereinbarten festen Zinssatz ("Festsatz"), als Dezimalzahl ausgedrückt, sowie (c) dem Quotienten im Sinne des Abs. 5.

Im Fall von Zinsbegrenzungsgeschäften ist der variable Satz nach Maßgabe des Einzelabschlusses vorbehaltlich Absatz 4 jeweils

für Zahlungen durch die als Überschuß-Zahler (oder Cap-bzw. FRA-Verkäufer) bezeichnete Partei der vereinbarte Basis-Satz abzüglich des Satzes, der im Einzelabschluß als Höchstsatz (oder Cap-Rate) bzw. Terminsatz festgelegt wird, und

für Zahlungen durch die als Minderbetrags-Zahler (oder Floor-Verkäufer bzw. FRA-Käufer) bezeichnete Partei der Satz, der im Einzelabschluß als Mindestsatz (oder Floor-Rate) bzw. Terminsatz festgelegt wird, abzüglich des vereinbarten Basis-Satzes.

Wird eine Zahlung nicht nach Ablauf, sondern zu Beginn des betreffenden Berechnungszeitraums geleistet, so wird der nach Abs. 1 oder 2 zu ermittelnde Betrag diskontiert, indem er durch einen Betrag dividiert wird, der sich bei einem Berechnungszeitraum von einem Jahr oder weniger nach der Formel

$$1 + \frac{L \times D}{B}$$

und bei einem Berechnungszeitraum von mehr als einem Jahr nach der Formel

$$\left(1 + L\right)^{\frac{D}{B}}$$

errechnet.

Dabei ist

L   der für den betreffenden Berechnungszeitraum ermittelte Basis-Satz oder sonstige vereinbarte Diskontsatz, als Dezimalzahl ausgedrückt, also z. B. 0,07 im Fall eines Basis- oder Diskontsatzes von 7 %;

D   die Anzahl der Tage des Berechnungszeitraums;

B   360, es sei denn, die vereinbarte Vertragswährung ist eine Währung, für die der Basis- oder sonstige vereinbarte Diskontsatz nach Marktusance auf der Grundlage von 365 bzw. im Falle eines Schaltjahres 366 Tagen berechnet wird; in diesem Fall ist B = 365 bzw. 366.

Diese Regelung gilt, sofern nichts anderes vereinbart ist, stets für Terminsatzvereinbarungen (Forward Rate Agreements). Bei

sonstigen Geschäften gilt sie nur dann, wenn im Einzelabschluß eine Diskontierung vereinbart ist.

(5) "Quotient" ist nach Maßgabe des Einzelabschlusses
a) die Anzahl der tatsächlich abgelaufenen Tage des Berechnungszeitraums, für den der Betrag zu berechnen ist, dividiert durch die Zahl 360 ("365/360"); oder
b) die Anzahl der abgelaufenen Tage dieses Berechnungszeitraums, berechnet auf der Basis eines 360-Tage-Jahres mit 12 Monaten zu je 30 Tagen, dividiert durch die Zahl 360 ("360/360"); oder
c) die Anzahl der tatsächlich abgelaufenen Tage dieses Berechnungszeitraums, dividiert durch die Zahl 365 bzw. im Fall von Schaltjahren 366 ("365/365"); oder
d) die Anzahl der tatsächlich abgelaufenen Tage dieses Berechnungszeitraums, dividiert durch die Zahl 365 ("366/365").

(6) "Berechnungszeitraum" ist der Zeitraum, der mit dem Anfangsdatum des Einzelabschlusses oder einem Zahlungstermin (einschließlich) beginnt und mit dem nächstfolgenden Zahlungstermin oder dem Enddatum (ausschließlich) endet, oder, sofern die Parteien im Einzelabschluß in bezug auf variable Beträge "Fälligkeitstag/Fälligkeitstag" vereinbart haben, der Zeitraum, der mit dem Anfangsdatum des Einzelabschlusses oder einem Fälligkeitstag (einschließlich) beginnt und mit dem nächstfolgenden Fälligkeitstag oder dem Enddatum (ausschließlich) endet. "Zahlungstermin" im Sinne dieses Vertrages ist der Tag, an dem, gegebenenfalls aufgrund einer Anpassung gemäß Nr. 3 Abs. 2, die Zahlung tatsächlich zu leisten ist; "Fälligkeitstag" ist der vertraglich vorgesehene Zahlungstag ohne Berücksichtigung einer solchen Anpassung.

(7) Ist ein variabler Betrag oder ein nach Abs. 2 Satz 2 zu berechnender Festbetrag zu zahlen, so wird die Bank diesen, im ersten Fall zugleich mit der jeweils anwendbaren Bezugsgröße, dem Vertragspartner mitteilen.

**7. Beendigung**

(1) Sofern Einzelabschlüsse getätigt und noch nicht vollständig abgewickelt sind, ist der Vertrag nur aus wichtigem Grund kündbar. Ein solcher liegt auch dann vor, wenn eine fällige Zahlung oder sonstige Leistung - aus welchem Grund auch immer - nicht innerhalb von fünf Bankarbeitstagen nach Benachrichtigung des Zahlungs- oder Leistungspflichtigen vom Ausbleiben des Eingangs der Zahlung oder sonstigen Leistung beim Empfänger eingegangen ist. Die Benachrichtigung und die Kündigung müssen schriftlich, fernschriftlich, telegraphisch, durch Telefax oder in ähnlicher Weise erfolgen. Eine Teilkündigung, insbesondere die Kündigung einzelner und nicht aller Einzelabschlüsse, ist ausgeschlossen. Nr. 12 Abs. 5 (B) bleibt unberührt.

(2) Der Vertrag endet ohne Kündigung im Insolvenzfall. Dieser ist gegeben, wenn das Konkurs- oder ein sonstiges Insolvenzverfahren über das Vermögen einer Partei beantragt wird und diese Partei entweder den Antrag selbst gestellt hat oder zahlungsunfähig oder sonst in einer Lage ist, die die Eröffnung eines solchen Verfahrens rechtfertigt.

(3) Im Fall der Beendigung durch Kündigung oder Insolvenz (nachstehend "Beendigung" genannt) ist keine Partei mehr zu Zahlungen oder sonstigen Leistungen nach Nr. 3 Abs. 1 verpflichtet, die gleichtägig oder später fällig geworden wären; an die Stelle dieser Verpflichtungen treten Ausgleichsforderungen nach Nrn. 8 und 9.

**8. Schadensersatz und Vorteilsausgleich**

(1) Im Fall der Beendigung steht der kündigenden bzw. der solventen Partei (nachstehend "ersatzberechtigte Partei" genannt) ein Anspruch auf Schadensersatz zu. Der Schaden wird auf der Grundlage von unverzüglich abzuschließenden Ersatzgeschäften ermittelt, die dazu führen, daß die ersatzberechtigte Partei alle Zahlungen und sonstigen Leistungen erhält, die ihr bei ordnungsgemäßer Vertragsabwicklung zugestanden hätten. Sie ist berechtigt, nach ihrer Auffassung dazu geeignete Verträge abzuschließen. Wenn sie von dem Abschluß derartiger Ersatzgeschäfte absieht, kann sie denjenigen Betrag der Schadensberechnung zugrunde legen, den sie für solche Ersatzgeschäfte auf

r Grundlage von Zinssätzen, Terminsätzen, Kursen, Marktprei-
n, Indices und sonstigen Wertmessern sowie Kosten und Aus-
gen zum Zeitpunkt der Kündigung bzw. der Kenntniserlangung
n dem Insolvenzfall hätte aufwenden müssen. Der Schaden
rd unter Berücksichtigung aller Einzelabschlüsse berechnet; ein
anzieller Vorteil, der sich aus der Beendigung von Einzel-
schlüssen (einschließlich solcher, aus denen die ersatzberech-
te Partei bereits alle Zahlungen oder sonstigen Leistungen der
deren Partei erhalten hat) ergibt, wird als Minderung des im
rigen ermittelten Schadens berücksichtigt.
Erlangt die ersatzberechtigte Partei aus der Beendigung von
zelabschlüssen insgesamt einen finanziellen Vorteil, so schul-
t sie vorbehaltlich Nr. 9 Abs. 2 und, falls vereinbart, Nr. 12 Abs.
der anderen Partei einen Betrag in Höhe dieses ihres Vorteils,
chstens jedoch in Höhe des Schadens der anderen Partei. Bei
r Berechnung des finanziellen Vorteils finden die Grundsätze
s Absatzes 1 über die Schadensberechnung entsprechende
wendung.

**Abschlußzahlung**

).Rückständige Beträge und sonstige Leistungen und der zu
stende Schadensersatz werden von der ersatzberechtigten
rtei zu einer einheitlichen Ausgleichsforderung in Euro
sammengefaßt, wobei für rückständige sonstige Leistungen
tsprechend Nr. 8 Abs. 1 Sätze 2 bis 4 ein Gegenwert in Euro
mittelt wird.

).Eine Ausgleichsforderung gegen die ersatzberechtigte Partei
rd nur fällig, soweit diese keine Ansprüche aus irgendeinem
chtlichen Grund gegen die andere Partei ("Gegenansprüche")
t. Bestehen Gegenansprüche, so ist deren Wert zur Ermittlung
s fälligen Teils der Ausgleichsforderung vom Gesamtbetrag der
sgleichsforderung abzuziehen. Zur Berechnung des Werts der
genansprüche hat die ersatzberechtigte Partei diese, (i)
weit sie sich nicht auf Euro beziehen, zu einem nach
öglichkeit auf der Grundlage des am Berechnungstag
ltenden amtlichen Devisenkurses zu bestimmenden Brief-Kurs
Euro umzurechnen, (ii) soweit sie sich nicht auf Geldzahlungen
ziehen, in eine in Euro ausgedrückte Schadensersatzforderung
nzuwandeln und (iii) soweit sie nicht fällig sind, mit ihrem
erwert (unter Berücksichtigung auch der Zinsansprüche) zu
rücksichtigen. Die ersatzberechtigte Partei kann die
sgleichsforderung der anderen Partei gegen die nach Satz 2
rechneten Gegenansprüche aufrechnen. Soweit sie dies
terläßt, wird die Ausgleichsforderung fällig, sobald und soweit
r keine Gegenansprüche mehr gegenüberstehen.

). Übertragung

e Übertragung von Rechten oder Verpflichtungen aus dem Ver-
g bedarf der vorherigen schriftlichen, fernschriftlichen, telegra-
ischen, durch Telefax oder in ähnlicher Weise mitgeteilten Zu-
immung der jeweils anderen Partei. Nr. 2 Abs. 2 gilt entspre-
end.

I. Verschiedenes

) Sind Bestimmungen des Vertrages unwirksam oder undurch-
hrbar, so bleiben die übrigen Vorschriften hiervon unberührt.
egebenenfalls hierdurch entstehende Vertragslücken werden
rch ergänzende Vertragsauslegung unter angemessener Be-
cksichtigung der Interessen der Parteien geschlossen.

) Der Vertrag unterliegt dem Recht der Bundesrepublik
eutschland.

) Nicht ausschließlicher Gerichtsstand ist der Ort der Nieder-
ssung der Bank, durch die der Vertrag abgeschlossen wird.

) Der Rahmenvertrag in der hiermit vereinbarten Fassung gilt
ch für alle etwaigen Einzelabschlüsse der Parteien unter dem
hmenvertrag in einer früheren Fassung. Diese gelten als Ein-
labschlüsse unter dem Rahmenvertrag in dieser neuen Fas-
ng. Für diese Einzelabschlüsse bleibt die bisherige Fassung
doch insoweit maßgeblich, als dies zum Verständnis der in
en getroffenen Regelungen erforderlich ist.

## 12. Besondere Vereinbarungen

(1) Die folgenden Absätze 2 bis 5 gelten nur, soweit die dazu
bestimmten Felder angekreuzt oder ausgefüllt sind.

[X] (2) In Nr. 3 Abs. 3 werden die Worte "des Vertrages" durch
"desselben Einzelabschlusses" ersetzt.

[X] (3) Der Zinszuschlag gemäß Nr. 3 Abs. 4 beträgt

**1 % p.a.**

(4) Nach Nr. 8 Abs. 2 Satz 1 wird folgender Satz eingefügt:
entweder

[X] Dies gilt vorbehaltlich Nr. 12 Abs. 5 (C) a) nur, falls die
ersatzberechtigte Partei aus mindestens einem Einzel-
abschluß (i) alle von der anderen Partei geschuldeten
Zahlungen oder sonstigen Leistungen endgültig und
unanfechtbar erhalten hat und (ii) bei Fortführung des
Vertrages selbst noch unbedingte oder bedingte Zah-
lungs- oder sonstige Leistungsverpflichtungen hätte.

oder

[ ] Dies gilt vorbehaltlich Nr. 12 Abs. 5 (C) a) nur, falls die
ersatzberechtigte Partei (i) aus sämtlichen Einzelab-
schlüssen alle von der anderen Partei geschuldeten
Zahlungen oder sonstigen Leistungen endgültig und
unanfechtbar erhalten hat und (ii) bei Fortführung des
Vertrages selbst noch unbedingte oder bedingte Zah-
lungs- oder sonstige Leistungsverpflichtungen hätte.

[X] (5) Internationale Geschäfte

(A) Falls eine Partei verpflichtet ist oder verpflichtet sein
wird, von einer durch sie zu leistenden Zahlung einen
Steuer- oder Abgabenbetrag abzuziehen oder einzubehal-
ten, wird sie die zusätzlichen Beträge an die andere Partei
zahlen, die erforderlich sind, damit die andere Partei den vol-
len Betrag erhält, der ihr im Zeitpunkt einer solchen Zahlung
zustehen würde, wenn kein Abzug oder Einbehalt erforder-
lich wäre. Dies gilt nicht, wenn die betreffende Steuer oder
Abgabe vom Heimatstaat des Zahlungsempfängers oder
einer in diesem Staat ansässigen Steuerbehörde auferlegt
oder erhoben wird. Heimatstaat ist der Staat, in dem der
Zahlungsempfänger seinen Sitz hat bzw. als ansässig ange-
sehen wird oder in dem sich die Niederlassung des Zah-
lungsempfängers befindet, die unter dem betreffenden Ein-
zelabschluß handelt.

(B) Falls aufgrund einer nach dem Abschlußdatum eines
Einzelabschlusses erfolgenden Änderung von Rechtsvor-
schriften oder von deren Anwendung oder amtlichen Ausle-
gung

a) zu erwarten ist, daß eine Partei am nächsten Fälligkeits-
tag in bezug auf eine durch sie zu leistende Zahlung zu-
sätzliche Beträge gemäß vorstehendem Unterabsatz (A) zu
zahlen hat außer auf Zinsen gemäß Nr. 3 Abs. 4., oder

b) eine Partei den Vertrag nicht mehr erfüllen darf,

so kann diese Partei (nachstehend die "betroffene Partei"
genannt) und im Falle b) auch die andere Partei (nachste-
hend die "Gegenpartei" genannt) den von der Änderung be-
troffenen Einzelabschluß unter Einhaltung einer Frist von
zwei Wochen auf einen durch sie zu bestimmenden Termin
kündigen; dieser Termin darf nicht mehr als einen Monat vor
dem Zeitpunkt liegen, an dem die Änderung wirksam wird.
Nr. 7 Abs. 3 bezieht sich im Fall einer solchen Kündigung nur
auf den oder die betroffenen Einzelabschlüsse. Die Gegen-
partei bzw. im Falle einer Kündigung durch die Gegenpartei
die betroffene Partei kann jedoch innerhalb einer Woche
nach Zugang der Kündigungserklärung durch Erklärung an
die kündigende Partei bestimmen, daß die Kündigung für
den Vertrag insgesamt gilt. Für die Form der Kündigung und
der Erklärung nach Satz 3 gilt Nr. 7 Abs. 1 Satz 3.

(C) Im Falle einer Kündigung aufgrund eines der in Unterabsatz (B) genannten Kündigungsgründe gilt Nr. 8 mit folgender Maßgabe:

a) Ersatzberechtigte Partei ist die Gegenpartei. Nr. 12 Abs. 4, falls vereinbart, findet keine Anwendung.

b) Sind beide Parteien betroffene Parteien und erleidet eine von ihnen einen Schaden, so hat die Partei, die insgesamt einen Vorteil aus der Beendigung erlangt oder den kleineren Schaden erleidet, der anderen Partei einen Betrag in Höhe der Hälfte der Differenz zwischen Vorteil und Schaden bzw. zwischen dem größeren und kleineren Schaden zu zahlen. Diese Rechtsfolge tritt auch dann ein, wenn die Kündigung nach Unterabsatz (B) Satz 1 Buchstabe b) oder die Erklärung nach Unterabsatz (B) Satz 3 durch die Gegenpartei abgegeben wird.

c) Für Zwecke der Berechnung des eigenen Vorteils oder Schadens gilt in vorstehendem Fall b) jede Partei als ersatzberechtigte Partei.

(D) Für etwaige Rechtsstreitigkeiten oder sonstige Verfahren vor deutschen Gerichten bestellt der Vertragspartner hiermit die unter (F) oder gegebenenfalls in mindestens einem Einzelabschluß zu diesem Zweck benannte Person zum Zustellungsbevollmächtigten.

(E) Jede Partei verzichtet hiermit unwiderruflich darauf, in Verfahren betreffend sie selbst oder ihr Vermögen aufgrund etwaiger Souveränitäts- oder ähnlicher Rechte Immunität vor Klage, Urteil, Vollstreckung, Pfändung (sei es vor oder nach Urteilserlaß) oder anderen Verfahren zu genießen oder geltend zu machen.

(F) Anschrift des Zustellungsbevollmächtigten in der Bundesrepublik Deutschland:



**Sonstige Vereinbarungen**

Klausel 9 sind im Bedarfsfall Euro durch US-Dollar zu ersetzen.





...terschrift(en) des Vertragspartners

(ist duly authorized Attorney)

Unterschrift(en) der Bank



Enclosure 15b

> Master Agreement dated .... September 2006

# MASTER AGREEMENT FOR
# FINANCIAL DERIVATIVES TRANSACTIONS

TRANSLATION COPY

Between

**Gorgonia di Navigazione S.p.A.**
**Via Giovanni Porzio 4, Centro Direzionale, Isola G/2**
**I-80143 Naples**
**Italy**
(hereinafter called the "Counterparty")

and

**Deutsche Schiffsbank Aktiengesellschaft** Bremen und Hamburg
Domshof 17
D 28195 Bremen
Federal Republic of Germany
(hereinafter called the "Bank")



the following is agreed:

### 1.Purpose and Scope of Agreement

(1) In order to manage interest and exchange rate risks and other price risks arising within the scope and their business operations, the parties hereto intend to enter into financial derivatives transactions to object of which is

 (a) the exchange of amounts of money denominated in different currencies or amounts of money calculated by reference to variable or fixed interest rates, exchange rates, prices or other calculation bases, including relevant market averages (indices) relating thereto, or

 (b) the delivery or transfer of securities, other financial instruments or precious metals, or the performance of similar obligations.

Financial derivatives transactions also include options, interest rate protection and similar transactions which provide that one party shall render performance in advance, or that performance shall be conditional.

(2) The terms and conditions set out below shall apply to each transaction which is entered into pursuant to this Master Agreement (hereinafter called a "Transaction"). All Transactions entered into pursuant to this Master Agreement shall among themselves and together with this Master Agreement constitute a single agreement (hereinafter called the "Agreement"); they shall be entered into in accordance with and in reliance on this principle, with a view to an aggregated risk assessment.

### 2.Transactions
1) Upon the parties having agreed on a Transaction, the Bank shall confirm the terms thereof to the Counterparty in writing, by telex, telegraph, facsimile or in similar form.
(2) Each party shall be entitled to request a signed confirmation of the Transaction, provided, however, that such confirmation

shall not be a precondition of the legal validity of the Transaction.

(3) The provisions of an individual Transaction shall prevail over the provisions of this Master Agreement.

### 3.Payments and Performances of Other Obligations

(1) Each party shall make the payments and carry out the other obligations due to the other party by the due date (at the latest) provided for in respect of the relevant Transaction.

(2) All payments shall be made to the payee's account specified for the Transaction in the contractual currency owing pursuant to the terms of the Transaction, free of all costs, in the manner customary for payments in such currency and in funds which are freely available on the due date. 

(3) If both parties are required to make payments under the Agreement in the same currency on the same day, the party which owes the higher amount shall pay to the other the difference between the amounts owed. The Bank shall, in due time before such payment becomes due, notify the Counterparty of the difference to be paid.

(4) In the event of non-payment by a party on the due date, interest shall accrue on the amount outstanding, until such amount is received, at a rate which shall be equal to the interbank interest rate charged by prime banks to each other for call deposits at the place of payment and in the currency of the amount outstanding for each day on which interest is to be charged, plus the interest surcharge referred to in Clause 12 sub-Clause (3). The right to make further claims for damages is not hereby excluded.

- 2 –

(5) If any due date is not a Banking Day, payments shall be made and other obligations performed, as stipulated in the terms of the relevant Transaction, on any of the following:

(a) the immediately preceding Banking Day, or

(b) the immediately following Banking Day, or

(c) the immediately following Banking Day, unless this falls in the next calendar month, in which case payment shall be made or other obligation performed on the immediately preceding Banking Day.

## 4.Banking Day

"Banking Day" for the purpose of this Agreement shall mean each day (other than a Saturday or a Sunday) on which banks are open for business, including trading in foreign currency and acceptance of foreign currency deposits, at the financial centre(s) specified in respect of the Transaction.

## 5.Reference Basis

(1) Where a variable interest rate, exchange rate, price or other calculation basis ("Variable Basis") has been agreed in respect of a Translation, the Bank shall notify the Counterparty of the underlying reference basis on the day on which such Variable Basis is to be determined ("Determination Date") or promptly thereafter.

(2) Should it not be possible on a Determination Date to ascertain the reference basis agreed in respect of the relevant Transaction, the parties shall determine such reference basis using bases of calculation which approximate, as closely as possible, to those agreed in respect of such Transaction. If the reference basis is an interbank interest rate which has not been determined by mutual agreement within 20 days, the reference basis shall be the arithmetic mean of the interest rates at which two banks of international repute to be named by the Bank have offered time deposits in the contractual currency with equivalent maturities to first-class banks on the interbank market for amounts approximate to the reference amount at about 11.00 a. m. (local time on the interbank market concerned) on the Determination Date.

(3) An interest rate used as a reference basis ("Base Rate") shall, if not already such a multiple, be rounded upwards to the nearest multiple of one hundred-thousandth of a percentage point.

## 6.Method of Calculation

(1) Each variable amount to be paid in respect of any Transaction shall be the product of (a) the reference amount agreed for such Transaction, (b) the variable interest rate ("Variable Rate") calculated in accordance with Clause 5 and the terms of such Transaction, expressed as a decimal figure, and (c) the Quotient within the meaning of sub-Clause (5) below.

(2) Each fixed amount to be paid in respect of any Transaction shall be the amount stated in the terms of the Transaction, if the amount is specified as a figure. Otherwise it shall be the product of (a) the reference amount agreed for such Transaction, (b) the fixed interest rate ("Fixed Rate") agreed for such Transaction, expressed as a decimal figure, and (c) the Quotient within the meaning of sub-Clause (5) below.

(3) In the case of rate protection transactions, the Variable Rate shall be in each case subject to the terms of the relevant Transaction and without prejudice to the provisions of sub-Clause (4) below,

(a) for payments by the party designated as surplus payer (or Cap or FRA seller), the agreed Base Rate less the rate which is stated in the terms of the Transaction as the maximum rate (or Cap rate) or as the forward rate, and

(b) for payments by the party designated as deficit payer (or Floor seller or FRA buyer), the rate which is stated in the terms of the Transaction as the minimum rate (or Floor rate) or as the forward rate, less the agreed Base Rate.

(4) If a payment is not made upon expiration of the relevant Computation Period, but at the commencement thereof, the amount to be determined in accordance with sub-Clauses (1) and (2) above shall be discounted by dividing such amount by an amount which is calculated in the case of a Computation Period of one year or less according to the formula

$$1 + \frac{L \times D}{B}$$

and in the case of a Computation Period of more than one year according to the formula

$$(1+L)^{\frac{D}{B}}$$

where

L means the Base Rate determined, or other discount rate agreed, in respect of the relevant Computation Period, expressed as a decimal figure (i.e. 0.07, for instance, in the case of a Base Rate or discount rate of 7 %);

D means the number of days comprised in such Computation Period;
B means 360, unless the agreed contractual currency is a currency for which it is market practice to calculate the Base Rate or other agreed discount rate on the basis of 365 or, for leap years, 366 days; in such case B means 365 or 366, respectively.

– 3 –

The provisions set forth above shall, unless agreed otherwise, generally apply to Forward Rate Agreements. In the case of other transactions, they shall apply only if the terms of the Transaction provide for discounting.

(5) "Quotient" means, as stipulated in the terms of the relevant Transaction, any of the following:

(a) the number of days actually elapsed within the Computation Period for which the amount is to be calculated, divided by 360, ("365/360") or

(b) the number of days elapsed within such Computation Period, calculated on the basis of a 360-day year with 12 months of 30 days each, divided by 360, ("360/360") or

(c) the number of days actually elapsed within such Computation Period, divided by 365 or, in the case of a leap year, 366, ("365/365") or

(d) the number of days actually elapsed within such Computation Period, divided by 365 ("366/365").

(6) "Computation Period" means the period beginning with, and including, the commencement date of the Transaction, or a Payment Date, and ending with, but excluding, the next following Payment Date or the termination date, or, where the parties have stipulated "Due Date/Due Date" in the terms of the Transaction with respect to variable amounts, the period beginning with, and including, the commencement date of the Transaction, or a Due Date, and ending with, but excluding, the next following Due Date or the termination date. For the purposes of this Agreement, "Payment Date" means the day on which the payment is actually to be made, where applicable after adjustment in accordance with Clause 3 sub-Clause (5), and "Due Date" means the contractually agreed day for payment, ignoring any such adjustment.

(7) If a variable amount, or a fixed amount to be calculated pursuant to sub-Clause (2) above, sentence 2, is payable, the Bank shall notify the Counterparty of such amount together with, in the former case, the then applicable reference basis.

## 7.Termination

(1) Where Transactions have been entered into and not yet fully settled, the Agreement can only be terminated by either party for serious cause. Serious cause includes circumstances where payment or other performance due has not been received, for whatever reason, by the party entitled thereto within five Banking Days after the party liable to pay or to perform has been notified of non-receipt of the payment or other non-performance. Such notification, as well as the notice of termination, must be given in writing, by telex, telegraph, facsimile or in similar form. Partial termination, in particular a termination of some, but not all Transactions, is not permissible, without prejudice, however, to the provisions of Clause 12 sub-Clause (5) (B).

(2) The Agreement shall terminate, without notice, on the occurrence of insolvency. Insolvency occurs if an application is filed for the commencement of bankruptcy or other insolvency proceedings against the assets of either party and such party either has filed the application itself or is generally unable to pay its debts as they fall du or is otherwise in a situation which justifies the commencement of such proceedings.

(3) In the event of termination upon notice by either party or upon insolvency (hereinafter called "Termination"), neither party shall be obliged to make any further payment or perform any other obligation under Clause 3 sub-Clause (1) which would have become due on the same day or later; the relevant obligations shall be replaced by compensation claims in accordance with Clauses 8 and 9.

## 8.Claims for Damages and Compensation for Benefits Received



(1) In the event of Termination, the party giving notice or the solvent party, as the case may be, (hereinafter called "Party Entitled to Damages") shall be entitled to claim damages. Damages shall be determined on the basis of substitute transactions, to be effected without undue delay, which provide the Party Entitled to Damages with all payments and the performance of all other obligations to which it would have been entitled had the Agreement been properly performed. Such party shall be entitled to enter into contracts which, in its opinion, are suitable for this purpose. If it refrains from entering into such substitute transactions, it may base the calculation of damages on that amount which it would have needed to pay for such substitute transactions on the basis of interest rates, forward rates, exchange rates, market prices, indices and other calculation bases, as well as costs and expensed, at the time of giving notice or upon becoming aware of the insolvency, as the case may be. Damages shall be calculated by taking into account all Transactions; any financial benefit arising from the Termination of Transactions (including those in respect of which the Party Entitled to Damages has already received all payments and performance of all other obligations by the other party) shall be taken into account as a reduction of damages otherwise determined. 

(2) If the Party Entitled to Damages obtains an overall financial benefit from the Termination of Transactions, it shall owe the other party, subject to Clause 9 sub-Clause (2) and, where agreed, Clause 12 sub-Clause (4), a sum corresponding to the amount of such benefit, but not exceeding the amount of damages incurred by the other party. When calculating such financial benefit, the principles of sub-Clause (1) as to the calculation of damages shall apply mutatis mutandis.

## 9.Final Payment

(1) Any claims for overdue payments and for performance of other overdue obligations, and the damages which are payable, shall be combined by the Party Entitled to Damages into a single compensation claim denominated in Euro, for which purpose a money equivalent in Euro shall

- 4 -

determined, in accordance with the principles set forth in Clause 8 sub-Clause (1) sentences 2 to 4, in respect of claims for performance of such other overdue obligations.

(2) A compensation claim against the Party Entitled to Damages shall become due and payable only to the extent that such party does not, for any legal reason whatsoever, have any claims against the other party ("Counterclaims"). If Counterclaims exist, their value shall be deducted from the total amount of the compensation claim in order to determine the portion of the compensation claim that is due and payable. For the purpose of calculating the value of the Counterclaims, the Party Entitled to Damages shall (i) to the extent that they are not payable in Euro, convert such Counterclaims into Euro at a selling rate to be determined, if possible, on the basis of the official foreign-exchange rate applicable on the day of computation, (ii) to the extent that they are not claims for the payment of money, convert them into a claim for damages expressed in Euro and (iii) to the extent that they are not yet due and payable, take them into account at their present value (also having regard to interest claims). The Party Entitled to Damages may set off the compensation claim of the other party against the Counterclaims calculated in accordance with sentence 3. To the extent that it fails to do so, the compensation claim shall become due and payable as soon as and to the extent that it exceeds the aggregate amount of Counterclaims.

## 10.Transfer

The transfer of rights or obligations arising from the Agreement shall require in each case the prior consent of the other party, communicated in writing, by telex, telegraph, facsimile or in similar form. The provisions of Clause 2 sub-Clause (2) shall apply mutatis mutandis.

## 11.Miscellaneous

(1) If any provision of the Agreement is invalid or not capable of performance, the remaining provisions shall remain unaffected thereby. Any deficiency in the Agreement resulting therefrom shall be amended by way of interpretation of the Agreement, having due regard to the parties' interests.

(2) The Agreement is subject to the law of the Federal Republic of Germany.

(3) The courts of the location of the office of the Bank through which the Agreement is made shall have non-exclusive jurisdiction.

(4) The Master Agreement in the version hereby agreed shall also apply to all Transactions, if any, of the parties under the Master Agreement in an earlier version. Such Transactions shall be regarded as Transactions under the Master Agreement in this new version. However, the previous version shall remain authoritative for such Transactions to the extent that this is necessary in order to determine the proper meaning of the provisions thereof.

## 12.Special Provisions

(1) The following sub-Clauses (2) to (5) shall apply only to the extent that the appropriate spaces below have been marked with a cross or completed.

☒ (2)  In Clause 3 sub-Clause (3) the words "under the same Transaction" are substituted for the words "under the Agreement".

☒ (3)  The interest surcharge provided for in Clause 3 sub-Clause (4) shall be

| 1 % p. a. |
|---|

(4) After Clause 8 sub-Clause (2), sentence 1 the following sentence is inserted:

☒This shall, without prejudice to Clause 12 sub-Clause (5) (C) (a), apply only if, in relation to at least one Transaction, the Party Entitled to Damages (i) has finally and incontestably received all payments or other performances owed by the other party and (ii) would still have unconditional or conditional payment or other obligations itself if the Agreement were to continue,

or

☐This shall, without prejudice to Clause 12 sub-Clause (5) (C) (a), apply only if the Party Entitled to Damages (i) has finally and incontestably received, in relation to all Transactions, all payments or other performances owed by the other party and (ii) would still have unconditional or conditional payment or other obligations itself if the Agreement were to continue.

☒ (5) International transactions

(A) If a party is or will be obliged to deduct or withhold a tax amount or other fiscal charge from a payment which it is to make, it shall pay to the other party such additional amounts as are necessary to ensure that the other party receives the full amount to which it would have been entitled at the time of such payment if no deduction or withholding had been required. This shall not apply if the tax or fiscal charge concerned is imposed or levied by the home state of the payee or by a tax authority resident in such state. Home state means the state in which the payee has its domicile or is considered to be resident or in which the office of the payee through which it is acting for the relevant Transaction is located.

(B) If, as a result of any change in law, or in the application or official interpretation thereof, which occurs after the trade dated of a Transaction

(a) it is to be anticipated that, on the next due date, either party will have to pay additional amounts pursuant to the preceding sub-Clause (A) with regard to a payment which it is required to make, other than with regard to interest payable pursuant to Clause 3 sub-Clause (4), or

- 5 –

(b) either party is no longer permitted to perform the Agreement,

such party (hereinafter called the "Affected Party"), and in the case of (b) also the other party (hereinafter called the "Other Party"), may, by giving not less than two weeks' notice, terminate the Transaction affected by such change with effect as form a date to be designated by it, provided that such date may not be earlier than one month before the date on which such change becomes effective. In the event of such notice of termination, Clause 7 sub-Clause (3) shall apply only with respect to the Transaction(s) concerned. However, the Other Party or, in the event of the termination notice being given by the Other Party, the Affected Party may, within one week after receipt of the notice of termination, decide, by a declaration to that effect addressed to the party having given the notice of termination that the Agreement as a whole is terminated. For the form of the notice of termination and the declaration according to sentence 3, Clause 7 sub-Clause (1), sentence 3 shall apply.

(C) In the event of a termination notice being given on the basis of any of the grounds for termination mentioned in sub-Clause (B), Clause 8 shall apply subject to the following:

(a) The Other Party shall be regarded as the Party Entitled to Damages. Clause 12 sub-Clause (4), where agreed, shall not apply.

(b) If both parties are Affected Parties and either of them suffers damage, the party which obtains an overall benefit from the termination or which suffers the lesser damage shall pay to the other party a sum amounting to half the difference between such benefit and such damage, or between the greater and the lesser damage, as the case may be. The payment of such sum shall also be due if the notice of termination in accordance with

sub-Clause (B), sentence 1, letter (b) or the declaration in accordance with sub-Clause (B), sentence 3 is made by the Other Party.

(c) For the purpose of calculating its own benefit or damage, each party shall, in the case of (b) above, be considered to be a Party Entitled to Damages.

(D) For any legal dispute or other proceedings before German courts, the Counterparty hereby appoints as authorised agent for the service of process the person named for such purpose below or the person, if any, named for such purpose in relation to at least one Transaction.

(E) Each party hereby irrevocably undertakes not to claim, and hereby irrevocably waives, with respect to any proceedings regarding itself or its assets, any immunity based on sovereignty or similar rights from legal action, judgement, execution, attachment (whether before or after judgement) or other proceedings.

(F) Address of the person authorised to accept service of process in the Federal Republic of Germany:



Other provisions:

In Clause 9 replace Euro with United States Dollars as the case may be.

Signatures on behalf of the Counterparty

(by its duly authorized Attorney(s)

Signatures on behalf of the Bank

**MANAGERS' UNDERTAKING**                              **Enclosure 16**

From:   ...................... (Managers)      To:   Deutsche Schiffsbank Aktiengesellschaft
                                                     Domshof 17,
                                                     28195 Bremen,
                                                     Federal Republic of Germany

[date]

Dear Sirs,

**Loan of US$ 30,175,000.- MV "....................................."**

**1.     Loan Agreement**

We understand that under a Loan Agreement dated .... September 2006 (the "**Loan Agreement**") between (1) yourselves, Deutsche Schiffsbank Aktiengesellschaft (the "**Lender**") and (2) Gorgonia di Navigazione S.p.A. (the "**Debtor**"), the Lender has agreed to make a loan of US$ 30,175,000.- (the "**Loan**") available to the Debtor and that it is a condition to the Lender's agreement to make any part of the Loan available to the Debtor that we as managers (the "**Managers**") inter alia enter into this letter in favour of the Lender to confirm our appointment as managers of the m.v. "............................" (the "**Vessel**") registered under Italian flag in the ownership of the Debtor.

**2.     Definitions**

Words and expressions defined in the Loan Agreement shall have the same meanings when used herein.

**3.     Confirmation of Appointment**

We hereby confirm that:

(a)    we have been appointed as the managers of the Vessel and that we have accepted our appointment in accordance with the terms and conditions set out in a management agreement dated ............. in respect of the Vessel (appended hereto marked "A", being a true and complete copy of the management agreement - the "**Management Agreement**"); and

(b)    we have reviewed copies of the Loan Agreement and the Mortgage.

4.  **Undertakings**

The Managers undertake with the Lender that:

(a)  the Managers will not, without the prior written consent of the Lender, take any action or institute any proceedings or make or assert any claim on or in respect of the Vessel or its Insurances or its Earnings or any of them or any other property or assets of the Debtor subject to any encumbrance or right of set-off in favour of the Lender by virtue of any of the Securities executed in favour of the Lender pursuant to the Loan Agreement;

(b)  the Managers will discontinue any such action or proceedings or claim which may have been taken, instituted or made or asserted, promptly upon notice from the Lender to do so;

(c)  the Managers will promptly notify the Lender, and at the cost of the Managers, if at any time the aggregate of the amounts owed by the Debtor to the Managers and to third parties in respect of goods and services procured by the Managers on behalf of the Debtor pursuant to the Management Agreement (whether in respect of the Managers' remuneration or disbursements or otherwise) exceeds five hundred thousand Dollars (US$ 500,000) in respect of the Vessel;

(d)  the Managers will not do anything incompatible or inconsistent with the performance by the Debtor of its obligations under the Loan Agreement and the Securities.

(e)  the Managers shall not compete with the Lender in a liquidation or other winding-up or bankruptcy of the Debtor or in any proceedings in connection with the Vessel, its Earnings or Insurances;

(f)  the Managers shall upon the first written request of the Lender, and at the cost of the Managers, at any time following the Lender's notification to the Managers that an event of default has occurred and is continuing under the Loan Agreement deliver to the Lender all documents of whatsoever nature which the Managers hold in connection with the Debtor, the Vessel, its Earnings and Insurances; and

(g)  the Managers will at all times, and at the cost of the Debtor, comply with all national and international applicable laws relating to them or to the Vessel and shall procure that there are on board the Vessel valid certificates showing compliance therewith and will not make or permit to be made any substantial change in the structure, type or speed of the Vessel without first receiving written approval therefore from the Lender; and

(h)  the Managers will promptly notify the Lender in the event that they cease for any reason whatsoever to be the managers of the Vessel or if the Debtor purports to dismiss them as managers of the Vessel.

5.  **Representations and Warranties**

The Managers hereby represent and warrant:

(a)  that they will not enter into any addenda or supplements to the Management Agreement without the Lender's prior written consent; and

(b)   they have the power to execute and perform this letter and the transactions contemplated herein and in the Management Agreement and have taken all necessary action to authorise the entry into and performance of this letter, the Management Agreement and such transactions and will duly perform and observe the terms thereof.

## 6.   Law and Jurisdiction

The Agreement constituted by this letter shall be governed by and construed in accordance with German law. Place of jurisdiction is Bremen / Federal Republic of Germany, however the Lender reserves the right to chose as place of jurisdiction any place where the Vessel is situated or the Managers' place or any place of the Managers' branch office.

_____
(as Managers)

Enclosure 17

# General Loan Conditions

**I.**   The Debtor is obliged to acquire the prior consent of the Bank (which term in case the Loan is granted by more than one bank stands for the plural form) if

1.   he wholly or partly alienates the ship or encumbers her with mortgages, or other actions of similar nature;

2.   he renounces his right of disposal over the ship in favour of a third party by way of bareboat-charter, or appointment/change of manager ,

3.   the home port of the ship is transferred to another state;

4.   a change in the status of ownership by legal transaction occurs; or if he enters into amalgamation, demerger, merger or corporate reconstruction, or if there is any change in the ultimate beneficial ownership or control of the Debtor and/or any guarantor from that advised to the Bank by the Debtor prior to signing of the Loan Agreement;

5.   the purpose for which the ship was planned is changed;

6.   the ship undergoes conversions costing more than 10 % of the amount of her hull insurance;

7.   appurtenances or other equipment to which the mortgage pertains and which are necessary for the operation of the ship or which are of essential value are being removed without replacement or if removed parts are only replaced by leased parts.



**II.**   The Debtor is obliged to immediately notify the Bank if

1.   his entire shipping business is substantially reduced, the operation of the mortgaged ship is suspended or the mortgaged ship is laid-up for more than two months or a change in the Debtor's management occurs;

2.   the ship is going to be deleted from the ships' register or loses the right to fly the flag of its home country;

3.   the ship is arrested or put to public auction or the person or party entitled to dispose of the ship otherwise wholly or partly loses its power of disposal;

4.   the ship becomes involved in maritime or other court proceedings or is being encumbered with a mortgage by court order;

5.   the ship sustains an average, has been salvaged from distress at sea or has made use of third party assistance;

6.   maritime liens, a right of retention or claims due under ship mortgages are put forward against the ship;

7.   the ship has become a total loss, has been abandoned or becomes unworthy for repair;

8.   the ship has lost her assigned classification or the loss of her classification has been threatened.

**III.**   The Debtor is obliged to

1.   give permission to the Bank to inspect the ship's papers and records;

2.   allow the Bank at any time to go on board the ship to cause an inspection and to cause the production of a report on her condition;

3.   allow the Bank to supervise any conversion and repair of the ship and within two weeks by representation of receipts, to produce evidence to the Bank that the costs thereof have been fully paid;

4.   produce evidence to the Bank of any renewal or confirmation of the classification and/or the sailing permit within fourteen days thereafter;

5.   plead the defense of time limitation against any maritime lienor if the occasion arises; he hereby irrevocably authorizes the Bank to put forward this plea in his own name.

**IV.**   (1)   The Bank is entitled to refuse disbursement of the loan or to demand repayment of the entire outstanding part of the loan together with interest and incidental claims if

1.   payments owed by the Debtor have not been received by the Bank and this default shall have been unremedied for fourteen (14) days or in case of repeated default for three business days after written notice shall have been given to the Debtor by the Bank;

2.   the Bank's ship mortgages do not receive the agreed priority or if their legal validity or priority is contested;

3.   the person entered in the register as the ship's owner is not the owner of the ship or his title to the ship is contested;

4.   the Debtor or his authorized representative has made false statements on or prior to the disbursement of the loan;

5.   the Debtor does not use the loan amount for the indicated purpose or the appropriate utilisation has not been proved to the Bank on request within one week;

6.    the Debtor and/or any guarantor of the loan goes into liquidation, suspends his payments, or if a bankruptcy proceeding a composition proceeding or any other judicial or non-judicial proceeding is instituted with a view to averting payment difficulties;

7.    the condition of the ship deteriorates through mismanagement to the effect that the class may be suspended;

8.    the Debtor or the shipowner has not proved to the Bank within two weeks after being requested that maritime liens or rights of retention have been redeemed or that claims for which ship mortgages do exist have been paid;

9.    anything is done or permitted or omitted to be done by any of the Debtor and/or any of the guarantors which in the reasonable opinion of the Bank jeopardises or imperils (or may jeopardise or imperil) the rights conferred on the Bank by this Loan Agreement and/or the Securities (as per Clause 9 of this Loan Agreement), or if there occurs (in the opinion of the Bank) any material adverse change in the business, affairs or financial condition of any of the Debtor and/or any of the guarantors from that pertaining at the date of this Loan Agreement;

10.    any securities agreed for the loan cease to exist or their value decreases substantially;

11.    the Debtor does not comply with his obligations arising from the Loan Agreement and/or these loan conditions or if one of the events mentioned in clause II. no. 1. - 8. occurs.

(2)    In case more than one ships belonging to the Debtor are encumbered with ship mortgages in favour of the Bank the Bank may also refuse disbursement of the loan or demand repayment of the entire loan amount outstanding together with interest and incidental claims if the conditions precedent only apply to one ship.

**V.**    If the Bank has demanded early repayment of the loan for one of the reasons listed in clause IV. above it is entitled to demand that the Debtor shall transfer the ship to a port convenient to the Bank and if the Debtor does not comply with this request without delay to cause to have the ship transferred to such port. For this purpose the Debtor hereby irrevocably authorizes the Bank to give relevant instructions binding on those in command of the vessel and to implement all actions required in order to achieve this purpose in the name and for account of the Debtor as well as to make and receive in the name of the Debtor all required declarations towards public authorities and private persons.

**VI.**    (1)    All the Bank's costs and expenditures which arise out of the business relationship between the Bank and the Debtor, shall be borne by the Debtor, even if there is no disbursement of the loan, and are due for payment on the day of disbursement of such costs and expenditures. This refers in particular to expenditures for maintenance, repair, safeguarding, insurance, or transfer of the ship; for creation maintenance and securing of the ship mortgages or for the removal of any seizure of the ship, for required translation of documents drawn up in foreign languages and the fees for lawyers or other persons commissioned

- 4 -

by the Bank irrespective of their reimbursibility according to relevant regulations, for any stamp duties as well as for any costs resulting from the performance of all other obligations of the Debtor.

(2)    All amounts disbursed shall bear interest at the default interest rate from the day of disbursement.

**VII.**    (1)    The Bank is not liable for damage caused by interruption of its operation in consequence of force majeure, riot, official/governmental order, strikes or lock-out.

(2)    The Bank is neither liable for own slight negligence including negligence in connection with the choice of a third party commissioned to act on behalf of the Bank (Auswahlverschulden) nor for slight negligence of third parties.

**VIII.**    (1)    Should any part of the agreements entered into with the Debtor be invalid this shall not affect the validity of the remaining agreements;

(2)    the specific agreements entered into with the Debtor shall prevail over these general loan conditions.

(3)    Legally binding declarations of the Debtor and the Bank have to be in written form.

(4)    All supporting documents required by the Bank are to be delivered to the Bank in German or English language or with translation into one of these languages.

- - -