# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **COMMERZBANK AKTIENGESELLSCHAFT** | **CIVIL ACTION** |
| | **No. 13-6622 c/w 13-6761 & 14-472** |
| **VERSUS** | **REF: No. 14-472** |
| **M/V UTOPIE ET AL.** | **SECTION I** |

## ORDER AND REASONS

Before the Court is a motion for writ of attachment by plaintiff, Global Maritime Investments Cyprus Limited ("GMI"), relative to cash funds in the amount of $3,450,256.50, which are currently in the registry of the Court.[1] Defendant, Commerzbank Aktiengesellschaft ("Commerzbank") has filed an opposition,[2] plaintiff has filed a reply,[3] and Commerzbank has filed a sur-reply.[4] For the following reasons, the motion is **GRANTED.**

## BACKGROUND

This case is the most recently filed of three consolidated cases. In the lead case, Civil Action No. 13-6622, filed on December 11, 2013, Commerzbank brought an action against M/V UTOPIE *in rem* and Gorgonia di Navigazione S.R.L. ("Gorgonia") *in personam* seeking to enforce a maritime lien against UTOPIE, to attach the property of Gorgonia pursuant to a preferred ship mortgage, and

---

[1] R. Doc. No. 31, at 1.

[2] R. Doc. No. 33.

[3] R. Doc. No. 35.

[4] R. Doc. No. 40.

to obtain a judgment against Gorgonia pursuant to the mortgage held by Commerzbank.[5] UTOPIE was arrested on December 13, 2013,[6] and ultimately sold at an interlocutory sale for $23,750,000.00 on February 13, 2014.[7] On April 9, 2014, Commerzbank moved for entry of default and for default judgment as to UTOPIE.[8] The motion for entry of default was granted, and the motion for default judgment will be taken under advisement without oral argument on April 23, 2014.[9]

In the second case, Civil Action No. 13-6761, filed on December 20, 2013, GMI brought an action against UTOPIE *in rem* and Gorgonia *in personam* seeking to enforce a maritime lien for breach of a time charter party, to perfect a maritime attachment of Gorgonia's property within the district, and to assert GMI's right to possession and ownership of bunkers and fuel oils aboard UTOPIE.[10] Although GMI originally sought the issuance of a warrant *in rem*, its motion was dismissed as moot in light of the vessel sale in the lead case.[11]

The pending motion for writ of attachment was filed in the third case, Civil Action No.

---

[5] R. Doc. No. 1, at 1-2; *see also* R. Doc. No. 14, at 1-2. All record citations are to Civil Action No. 13-6622 unless otherwise noted.

[6] R. Doc. No. 13.

[7] R. Doc. No. 24; R. Doc. No. 27.

[8] R. Doc. No. 43; R. Doc. No. 44.

[9] R. Doc. No. 44.

[10] Civil Action No. 13-6761, R. Doc. No. 1, at 1-2.

[11] R. Doc. No. 29.

14-472. GMI brought this action against Commerzbank on February 28, 2014, seeking to enforce a claim for Commerzbank's breach of a duty to GMI pursuant to German law and to perfect a maritime attachment of Commerzbank's property within the district.[12]

In its complaint, GMI alleges that Commerzbank committed a tort under German law through a series of actions, culminating in the arrest of the UTOPIE.[13] The facts set forth in GMI's complaint are as follows. At all material times GMI was the time charterer of UTOPIE, an ocean-going bulk cargo vessel, pursuant to a time charter party (the "GMI charter") with Gorgonia.[14] On August 30, 2013, GMI sub-chartered UTOPIE to Cargill International SA of Geneva (the "Cargill Charter") for a voyage carrying grain from the U.S. Gulf to China.[15] "Pursuant to the GMI Charter, GMI directed the M/V UTOPIE to the Mississippi River where she was to load grain pursuant to the Cargill Charter."[16] UTOPIE arrived in the Mississippi River on December 12, 2013,[17] and she was arrested on December 13, 2013, pursuant to the warrant issued in the lead case.[18] This prevented the vessel "from proceeding to her loading berth to receive cargo under the Cargill Charter and . .

---

[12] Civil Action No. 14-472, R. Doc. No. 1, at 1-2.

[13] Civil Action No. 14-472, R. Doc. No. 1, at 3-4, 11.

[14] Civil Action No. 14-472, R. Doc. No. 1, at 2-3.

[15] Civil Action No. 14-472, R. Doc. No. 1, at 3.

[16] Civil Action No. 14-472, R. Doc. No. 1, at 3.

[17] Civil Action No. 14-472, R. Doc. No. 1, at 3.

[18] Civil Action No. 14-472, R. Doc. No. 1, at 4.

. [from] performing her obligations under the GMI and Cargill Charters."[19] Because of her arrest, UTOPIE will be unavailable to GMI for the remainder of the GMI Charter (through July 2014).[20]

GMI alleges that Commerzbank acted tortiously through its actions prior to the arrest of the vessel and by arresting the vessel.[21] GMI summarizes its allegations as follows:

> Commerzbank knew that Gorgonia was in dire financial strai[]ts and that it was continuing to charter the vessel so long as Commerzbank did not foreclose its mortgage. . . . Commerzbank effectively intervened in the management of Gorgonia by aiding and abetting what in effect amounted to insolvent trading on the part of Gorgonia, with a view to gaining time in order to bring about a private sale and later, after those attempts did not materialize, with a view to have the vessel sail to a location suitable and attractive for the purposes of foreclosing the bank's mortgage in a speedy, cost-effective and controlled matter. That decision and its execution resulted in the early, forced termination of GMI's charter party with Gorgonia, causing GMI substantial damages. It must have been clear to Commerzbank, at the time the decision was [made] to arrest and sell the M/V UTOPIE[,] that it would have a substantial damaging effect on GMI. Commerzbank, in those circumstances, should have at least deferred foreclosing the mortgage until such time that the M/V UTOPIE would have become free from chartering employment with an innocent third party such as, in this instance, GMI.[22]

**LAW AND ANALYSIS**

Commerzbank argues that the Court lacks subject matter jurisdiction because the tort alleged in GMI's complaint is not a maritime tort. Commerzbank also argues that GMI's motion does not comply with Rule B of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions. The Court considers each argument in turn.

---

[19] Civil Action No. 14-472, R. Doc. No. 1, at 4.

[20] Civil Action No. 14-472, R. Doc. No. 1, at 4.

[21] Civil Action No. 14-472, R. Doc. No. 1, at 4.

[22] Civil Action No. 14-472, R. Doc. No. 1, at 7, 10-11.

**I. Maritime Tort**

GMI's complaint is premised on Section 826 of the German Civil Code, which provides: "He who inflicts damage on somebody in a manner which conflicts with *bonos mores*, is liable to compensate the other in respect of the loss suffered thereby."[23] For purposes of analyzing whether the alleged violation of Section 826 in this case constitutes a maritime tort, the parties have agreed that the German tort at issue is analogous to tortious interference with a contract pursuant to U.S. law.[24]

It is well-settled that "a party seeking to invoke federal admiralty jurisdiction pursuant to 28 U.S.C. § 1333(1) over a tort claim must satisfy conditions both of location and of connection with maritime activity." *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995); *see also Sisson v. Ruby*, 497 U.S. 358 (1990); *Foremost Ins. Co. v. Richardson*, 457 U.S. 668 (1982); *Exec. Jet Aviation, Inc. v. City of Cleveland, Ohio*, 409 U.S. 249 (1972).

The maritime location test requires that a plaintiff demonstrate that the tort occurred on navigable water or, if the injury was suffered on land, that it was it was caused by a vessel on navigable water. *Scarborough v. Clemco Indus.*, 391 F.3d 660, 663 (5th Cir. 2004) (citing *Grubart*, 513 U.S. at 534-35).

The maritime connection test has two requirements. "A court, first, must 'assess the general features of the type of incident involved,' to determine whether the incident has 'a potentially

---

[23]Civil Action No. 14-472, R. Doc. No. 1, at 12. The Court has no reason to question this translation as set forth in the verified complaint, which is supported by a statement under penalty of perjury by German maritime attorney Dr. Ulrich H. Stahl. Civil Action No. 14-472, R. Doc. No. 1, at 11.

[24]R. Doc. No. 47, at 1.

disruptive impact on maritime commerce.'" *Grubart*, 513 U.S. at 534 (citation omitted). "Second, a court must determine whether 'the general character' of the 'activity giving rise to the incident' shows a 'substantial relationship to traditional maritime activity.'" *Id.* (quoting *Sisson*, 497 U.S. at 365, 364 & n.2). "[A]s long as one of the putative tortfeasors was engaged in traditional maritime activity the allegedly wrongful activity will 'involve' such traditional maritime activity and will meet the second nexus prong." *Id.* at 541. The analysis must be conducted based on a "description of the incident at an intermediate level of possible generality." *Id.* at 538.

### A. Maritime Location

In applying the location test, the Court looks to "'where the alleged wrong took effect,' rather than to the locus of the allegedly tortious conduct." *Wiedemann & Fransen, A.P.L.C. v. Hollywood Marine, Inc.*, 811 F.2d 864, 866 (5th Cir. 1987) (quoting *Exec. Jet*, 409 U.S. at 266). Commerzbank argues that GMI's alleged injuries "took effect on land at GMI's principal place of business in Greece, or perhaps at the location of GMI's bank accounts, rather than on navigable waters."[25] GMI asserts that "[t]here could be no more direct effect on navigable waters than preventing a vessel from loading cargo and from performing her voyages."[26]

"[I]nterference with a maritime contract does not vest the court with admiralty tort jurisdiction absent an impact on navigable waters." *Kuehne & Nagel (AG & Co) v. Geosource, Inc.*, 874 F.2d 283, 289-90 (5th Cir. 1989). Accordingly, "the Fifth Circuit has repeatedly held that a tortious interference with a contract claim does not fall within federal admiralty jurisdiction when the effect of the alleged tortious conduct is felt on land where the contracts were to be performed."

---

[25] R. Doc. No. 33, at 8.

[26] R. Doc. No. 35, at 10.

*N.Y. Marine & Gen. Ins. Co. v. McDermott Int'l, Inc.*, No. 04-2548, 2005 WL 1400450, at *6 (E.D. La. June 1, 2005) (citations omitted). For example, in *Wiedemann*, the plaintiffs were attorneys retained by an employee to represent him in his claim against his employer for personal injuries sustained aboard a vessel. *Id.* at 865. The employee met with members of his employer's claims department and agreed to settle all of his claims, notwithstanding the fact that his attorneys were not there and that the employee had contractually agreed not to settle his claim without their presence. *Id.* The attorneys brought suit against the employer, alleging that it had tortiously interfered with the contract between the attorneys and the employee. *Id.* The Fifth Circuit ruled that the employer's settlement with the employee did not constitute a maritime tort because the alleged tort took effect in land, where the attorneys performed their contingency fee contract by bringing suit against the employer, rather than on navigable waters. *Id.* at 866.

Although *Wiedemann* involved a claim of tortious interference, the rule it articulates does not suggest that admiralty jurisdiction is lacking in the present case. Here, the charters with which Commerzbank allegedly interfered took effect through the loading of cargo and performance of voyages.[27] Accordingly, the application of the reasoning in *Wiedemann* to the instant case supports the exercise of admiralty jurisdiction because the "interfered-with contracts were to have been performed" on navigable waters and, accordingly, the interference took effect on navigable waters. *See Egorov, Puchinsky, Afanasiev, & Juring v. Terriberry, Carroll & Yancey*, 183 F.3d 453, 456 (5th Cir. 1999). That the wrong also took effect relative to GMI's bank accounts or principal place of business on land would be true in almost any case alleging an economic injury, and the Fifth Circuit's reasoning in cases like *Wiedemann* supports a more nuanced approach.

---

[27]R. Doc. No. 35, at 10.

The Court need not determine whether maritime jurisdiction would exist if Commerzbank had not been the entity that arrested the vessel or, similarly, if GMI relied on a theory of fraudulent inducement. *See Kuehne & Nagel*, 874 F.2d at 289 (concluding admiralty jurisdiction did not exist where the misrepresentations that fraudulently induced a party to enter into a contract "had their desired 'effect' on land when they prompted Kuehne & Nagel to sign the contracts of affreightment"). Here, GMI alleges that the arrest was one of the critical acts constituting the alleged tortious interference: without the arrest, the contracts would have been performed on navigable waters. "It is clear that the arrest of a vessel is an 'injury at sea and properly falls under maritime law." *Exter Shipping, Ltd. v. Kilakos*, 310 F. Supp. 2d 1301, 1310 (N.D. Ga. 2004) (concluding tortious interference with a contract was a maritime tort) (citing *Merchants Nat'l Bank of Mobile v. Dredge General G.L. Gillespie*, 663 F.2d 1338, 1345 (5th Cir. 1981)). The Court agrees with GMI that its allegations of "wrongfully arresting a vessel on navigable waters, and directly preventing the performance of two vessel charter parties to carry cargo and . . . operate on navigable waters satisfy" the location test.[28]

**B. Maritime Connection**

Commerzbank offers only a conclusory statement that GMI cannot satisfy the maritime connection test.[29] In light of Commerzbank's failure to present substantive argument as to this point, the Court concludes that the alleged wrongful arrest of a vessel, resulting in the non-performance of maritime charter parties in place at the time of the arrest, satisfies the maritime connection test. *See id.*

---

[28]*See* R. Doc. No. 35, at 11.

[29]R. Doc. No. 33, at 7.

**II. Rule B Compliance**

> Rule B provides, in relevant part:
>
> (a) If a defendant is not found within the district when a verified complaint praying for attachment and the affidavit required by Rule B(1)(b) are filed, a verified complaint may contain a prayer for process to attach the defendant's tangible or intangible personal property—up to the amount sued for—in the hands of garnishees named in the process.
>
> (b) The plaintiff or the plaintiff's attorney must sign and file with the complaint an affidavit stating that, to the affiant's knowledge, or on information and belief, the defendant cannot be found within the district. The court must review the complaint and affidavit and, if the conditions of this Rule B appear to exist, enter an order so stating and authorizing process of attachment and garnishment. The clerk may issue supplemental process enforcing the court's order upon application without further court order.

The parties agree that Commerzbank has property in the district for purposes of the Rule B analysis,[30] and the only Rule B requirement at issue is whether Commerzbank can be found within the district. Commerzbank argues that it could have been "found in the district" because it is a party in a related and consolidated case.

"[T]he determination of whether the defendant can be found within the district must be made before attachment is ordered." *Heidmar, Inc. v Anomina Ravennate Di Armanento Sp.A. of Ravenna*, 132 F.3d 264, 267-68 (5th Cir. 1998). A defendant is "found in the district" if it is subject to personal jurisdiction and service of process within the district. *Id.* at 268. Commerzbank argues that, by filing its own lawsuit in the lead case, it consented to personal jurisdiction for all claims "sharing common questions of law or fact"—i.e., for claims that could be consolidated with the lead case.[31] Commerzbank similarly argues that, by consolidating the three cases, the Court made

---
[30]R. Doc. No. 47, at 1.

[31]R. Doc. No. 33, at 4.

Commerzbank, the plaintiff in the lead case, a party to the member cases.[32] Commerzbank cites no authority, however, for the proposition that a party in one action is also a party to all other actions which have been consolidated. Accordingly, personal jurisdiction over Commerzbank relative to GMI's lawsuit was not established by Commerzbank's lawsuit against Utopie and Gorgonia.

Moreover, Commerzbank does not identify a valid means by which it would have been subject to service of process in the instant case. Commerzbank suggests that because both it and GMI had already appeared in the other consolidated cases, GMI's claim could have been asserted simply by filing it with the clerk and serving it upon opposing counsel.[33] However, prior to the filing of Civil Action No. 14-472, there was no case to which both Commerzbank and GMI were parties.[34] Accordingly, there was no case through which GMI could have asserted a cross-claim against Commerzbank.[35] In sum, Commerzbank offers no persuasive argument for the assertion that it could have been "found in the district" at the time of GMI's filing.

## CONCLUSION

For the foregoing reasons, the Court concludes that GMI's allegations satisfy the location and maritime connection tests and that GMI's motion for writ of attachment complies with the Rule B requirements. The Court will consider via a separate motion Commerzbank's argument that German law does not apply. Similarly, the Court will consider via a separate motion the parties'

---

[32]R. Doc. No. 33, at 4.

[33]R. Doc. No. 33, at 5 (citing Fed. R. Civ. P. 5(d)).

[34]Commerzbank is a party in the lead case, but it is not a party in the case that was filed second. GMI was a party in the case that was filed second, but it is not a party in the lead case. Commerzbank has not argued that GMI was required to intervene in the lead case.

[35]The Court need not address whether GMI would have been obliged to file a cross-claim rather than a separate lawsuit if such a cross-claim was an available means of raising its claim.

dispute as to whether GMI's settlement agreement with Gorgonia has any effect on defendant's liability.

**IT IS ORDERED** that the motion for writ of attachment is **GRANTED**.

New Orleans, Louisiana, April 16, 2014.

_____
 **LANCE M. AFRICK
UNITED STATES DISTRICT JUDGE**